[No. 789.]

# THE STATE OF NEVADA, RESPONDENT, *v.* PETER LARKIN, APPELLANT.

REPORTERS' NOTES—MINUTES OF THE TRIAL.—The legislature, in using the words "minutes of the trial," in section 450 of the criminal practice act (1 Comp. L. 2075), meant only the minutes as kept by the clerk, and recorded in the minute book containing the proceedings of the trial, that are daily read by the clerk and approved by the court.

BILL OF EXCEPTIONS—REVIEW OF EVIDENCE.—There is no provision of the statute that will authorize this court to review or examine the evidence in a criminal case, unless it is embodied in a bill of exceptions.

IDEM—REPORTERS' NOTES.—The reporters' notes of the proceedings of a trial can only be considered when adopted by the court as correct, and included in a bill of exceptions, settled and signed by the judge.

INDICTMENT FOR MURDER.—*Held,* sufficient.

CHALLENGE TO GRAND JURORS—RIGHTS OF DEFENDANT.—The defendant was indicted at the October term, 1875. The grand jury for the January term, 1876, was impaneled February 2, 1876. The indictment found at the October term was dismissed February 21, 1876. On the first day of March, the grand jury found another indictment. The defendant during the whole of this time was confined in the county jail. *Held,* that at the time the grand jury was impaneled (February 2, 1876) defendant was not held to answer before it for any offense.

IDEM—REFUSAL OF DEFENDANT TO EXERCISE CHALLENGE.—Where the defendant had the privilege after the indictment was found, under the ruling of the court as well as by virtue of the provisions of section 276 of the criminal practice act, to move to set aside the indictment on any ground which would have been good ground of challenge either to the panel, or any individual grand juror, and refused to exercise the privilege: *Held,* that he is not in a position to complain of the ruling of the court in refusing to set aside the indictment.

ALLOWANCE OF CHALLENGE TO JURORS, NOT SUBJECT TO REVIEW.—Where the prosecution challenges a juror for implied bias in entertaining such con-

scientious opinions as would preclude his finding defendant guilty of murder in the first degree, and the court allows the challenge: *Held*, that under the provisions of section 421 of the criminal practice act, (1 Comp. L. 2046) the allowing of challenges by the court for implied bias is not subject to review.

COURT AUTHORIZED TO DISCHARGE JUROR.—The court may, without a challenge from either party, upon good cause shown, discharge a juror at any time before he is sworn.

IDEM.—The sworn statement of a juror is *prima facie* sufficient to authorize the court to act.

IDEM.—Before the defendant can ask for a reversal upon this ground, he must show that he has in some manner been prejudiced by the action of the court.

IDEM—IMPARTIAL JURY.—So long as an impartial jury is obtained neither party has the right to complain of the action of the court in discharging a juror not challenged by either party.

MOTIVE FOR COMMISSION OF CRIME.—The prosecution has the right to offer any evidence tending to prove a motive for the commission of the crime.

CROSS-EXAMINATION OF A WITNESS.—Every defendant in a criminal case is entitled to a full and perfect cross-examination of every witness who testifies against him.

IDEM.—Where a witness for the prosecution had testified before a coroner's jury tending to exculpate the defendant, and on the trial testified to a different state of facts and upon cross-examination refused to answer some of the questions asked by counsel as to what she had sworn to before the coroner's jury, giving as an excuse for not answering, that she was so intoxicated at that time that she did not know what she testified to: *Held*, that such refusal to answer did not authorize the court to strike out her testimony.

IDEM—REMARKS OF THE COURT.—The court in refusing to strike out the testimony said in the presence of the jury: "I think the witness has answered all the questions, with the exception of some few matters as to her impeachment, and so far as that is concerned, I will relax the rule whenever it is desired to impeach her:" *Held*, that these remarks did not tend to prejudice the defendant.

CRIMINATING CIRCUMSTANCE—WEAPONS BELONGING TO DEFENDANT.—Where the pistol, with which the crime was committed, belonged to defendant, and was found in defendant's bed-room shortly after the homicide: *Held*, that these facts tended to establish one link in the chain of circumstantial evidence, and the court was not authorized to withdraw its consideration from the jury.

IDEM.—The fact that other parties had access to defendant's bed-room might have the tendency to weaken the force of this link in the chain of evidence, but it would not, of itself, destroy it.

CREDIBILITY OF WITNESS—WANT OF CHASTITY.—Defendant asked the court to give this instruction: "The jury may, and it is their duty, to take into consideration the chastity or want of chastity of any witness for the state, in determining the credibility of such witness:" *Held*, that it was calculated to mislead the jury, and was properly refused.

Idem.—The general rule is that evidence of bad character for chastity, where such character is collaterally, not directly, in issue, is not admissible for the purpose of impeaching the credibility of a witness.

Idem.—Want of chastity might in some instances include a want of veracity, but this is not always the case. In impeaching the character of a witness the inquiry in chief should be restricted to his general reputation for truth and veracity.

Excitement and Prejudice of Bystanders.—The defendant claimed that his case was prejudiced by the action of the bystanders, during the argument of the district attorney, by clapping their hands, stamping the floor and benches, etc., etc. The affidavits produced by the state show that the spectators but once evinced a desire to applaud the district attorney, and the court immediately suppressed the manifestation: *Held*, that defendant's case was not improperly prejudiced, and that the court did not err in refusing a new trial.

Appeal from the District Court of the First Judicial District, Storey County.

The indictment, after the caption and heading, reads as follows:

"Peter Larkin is accused by the grand jury of the county of Storey, by this indictment, of the crime of murder, committed as follows, to wit: that on or about the fourth day of August, A.D. 1875, and before the finding of this indictment, at the county of Storey and state of Nevada, he, the said Peter Larkin, with force of arms, in and upon the body of one Daniel Corcoran, in the peace of said state, then and there being, willfully, feloniously, and without authority of law, and of his malice aforethought, did make an assault, and that the said Peter Larkin a certain pistol then and there charged with gunpowder and leaden bullets and capped, and then and there said pistol being a deadly weapon, which said pistol he, the said Peter Larkin, then and there had and held, then and there feloniously, without authority of law, and of his malice aforethought, did discharge and shoot off to, against, and upon the body of the said Daniel Corcoran, thereby giving to him, the said Daniel Corcoran, then and there, as aforesaid, a mortal wound, of which said mortal wound he, the said Daniel Corcoran, afterwards, to wit: on the fifth day of August, A.D. 1875, died at the county aforesaid. And so the jurors aforesaid, upon their oaths, do say, that the said Peter

Larkin, him, the said Daniel Corcoran, in the manner and by the means aforesaid, feloniously, without authority of law, and of his malice aforethought, did kill and murder, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the said state of Nevada." (Signed by the district attorney of Storey county.)

To this indictment the defendant interposed a demurrer, alleging the following grounds:

I. That it does not substantially conform to sections 234 and 235 of the criminal practice act in this, to wit: first, the indictment does not contain a statement of the acts constituting the alleged offense in ordinary and concise language, and in such a manner as to enable a person of common understanding to know what is intended. Second, the time of the commission of the alleged offense is not stated with sufficient certainty. Third, it does not appear that the said Corcoran ever died from any act of the defendant, or if dead, that he died within a year and a day from the time of the infliction of the said wound. Fourth, the indictment does not follow the form as laid down by the statute.

II. That more than one offense is charged in the indictment.

III. That the facts stated in the said indictment do not constitute a public offense.

The demurrer was overruled by the court.

The other facts are sufficiently stated in the opinion.

*Louis Branson,* for Appellant.

I. The court erred in not sustaining the demurrer to the indictment.

II. It erred in not allowing the defendant to challenge the grand jury. It is the practice to allow challenges; the law provides for it, and why not allow it? It is a right secured to any defendant who is in custody on any charge. In the case at bar the defendant was not presumed to know when the grand jury met, and, in fact, did not know when it met, and could not have asserted his right if he had wanted to do so ever so much; and, therefore, the rule laid down in

*People* v. *Romero* (18 Cal. 93), is not applicable in this case. Besides, the doctrine of that case is not sound law, and cannot be, under any circumstances. To require the defendant in case of felony to take notice, at his peril, of any law or of any action had in court with his case, when he is locked up in an iron prison and not allowed to see any one but his counsel, is bad law in any country and under any system, and there is no reason for the rule.

III. The challenges interposed by the prosecution to the jurors should have been overruled. The gist of the cause of challenge, under the ninth subdivision of section 340, criminal practice act, is conscientious scruples as to capital punishment; and the record shows that such scruples did not exist in the case of the jurors Klein, Taylor, and Randolph. (1 Arch. Cr. L. 553; *Commonwealth* v. *Webster*, 5 Cush. 295; *People* v. *Stewart*, 7 Cal. 140.)

IV. The court erred in excusing the juror Wilson, neither party challenging him. This action of the court was had on the bare statement of the juror that he was not a citizen of the United States, without there being one single fact before the court to determine that question, which is a mixed question of law and fact.

V. The court erred in allowing the state to prove adultery between the witness Nellie Sayres and the prisoner. It was unnecessary to do this in order to show motive. The ill feeling existing between them could have been shown by other evidence competent to show malice without proving adultery, which had a tendency to prejudice the minds of the jury against him unnecessarily.

VI. The court erred in refusing to strike out the whole of the evidence of the witness Nellie Sayers. Where a witness refuses to answer all the questions on the cross-examination, and the court has no power to compel her, and does not compel her to do so, the only remedy the party has is to strike out the whole of the evidence and withdraw it from the jury. In making the ruling on the motion to strike out, the court makes a statement in the presence of the jury it had no right to make, and which had a tendency to damage the defendant's right.

VII. The court erred in refusing the fifth instruction asked by the prisoner. If other persons had possession of the pistol about the time of the shooting, and might have had equal access to and use of the same, and if other persons had access to the prisoner's bedroom after the shooting occurred, then no inference of guilt could be drawn from the fact that the prisoner owned the pistol, or that it was found in his bedroom.

VIII. The court erred in refusing the fifteenth instruction asked by the prisoner. If the rule that want of chastity is good ground of impeaching the credibility of any female witness in any case, it is time it should be so settled in this court. No man's life should be forfeited on such evidence.

IX. The court erred in refusing to grant a new trial on account of the part the bystanders or crowd took in the proceedings. At best, the prisoner was tried by a jury exceedingly prejudiced, and this action of the populace gives the trial more the character of that of a mob than that of a judicial trial. It is the settled belief of the prisoner that the prejudice of the jury and the action of the populace had more to do in influencing the verdict of the jury than all the evidence in the case.

*J. R. Kittrell, Attorney-General, and Dickson & Lindsay,* for Respondent.

I. The indictment is in all respects complete, and fully complies with the requirements of sections 234 and 235 of the criminal practice act. (*People* v. *Dolan,* 9 Cal. 576; *State* v. *Anderson,* 4 Nev. 265.)

II. A challenge to the panel or individual grand juror is a personal privilege, and one which the defendant in a criminal case may exercise or waive at his option. (*People* v. *Beatty,* 14 Cal. 566; 15 Id. 329.)

Assuming it to be true that appellant had not been held to answer before the finding of the indictment, his neglect to move to set aside the indictment, as permitted by section 276 of the criminal practice act, precludes him from afterwards taking the objections mentioned in sections 275 and 276 of said act. (*Vide* Crim. Pr. Act, sec. 277.)

The privilege to challenge the panel of the grand jury must be ask'ed for by the accused, and the court need not offer him his privilege of challenge unless he first demand it. (*People* v. *Romero*, 18 Cal. 89.)

III. The rulings of the court in allowing the challenges interposed by the district attorney to the jurors, Kline, Taylor, and Randolph, were correct. (Crim. Pr. Act, sec. 340; *State* v. *Salge*, 1 Nev. 455.)

. IV. The questions asked of the witness, Nellie Sayers, by the district attorney, were proper. The object in asking them was to show a motive on the part of the defendant for the commission of the homicide. (Roscoe's Crim. Ev., p. 88, and authorities cited in the text and note; 1 Whar. C. L., sec. 635; Wills' Cir. Ev., 57–8; *Johnston* v. *State*, 17 Ala. 618; *State* v. *Rash*, 12 Ire. 382; 9 Conn. 46.)

V. Defendant's motion to strike out the testimony of the witness, Nellie Sayers, was properly overruled. It should have been submitted to the jury unless the witness had been successfully impeached. The offer of the court below to relax the rule and permit defendant's counsel to introduce evidence in defense to contradict the witness, just the same as if she had answered counsel's question directly, was going as far as defendant had a right to ask, and was indeed altogether favorable to defendant.

VI. The court should have refused to give instruction, because there is no evidence contained in the record to make it pertinent. (*People* v. *Sanchez*, 24 Cal. 17.)

VII. We know of no rule of law which excludes evidence emanating from an unchaste woman; though a female may lack this great moral quality, still it does not follow that because of such deficiency she is not to be believed on oath.

By the Court, HAWLEY, C. J.:

The defendant, Peter Larkin, was convicted of murder in the first degree. He appeals from the judgment and from the order of the court overruling his motion for a new trial; also from the order of the court overruling his motion in arrest of judgment. Upon the day set for hearing the argu-

ment on appeal, he moved this court for a writ of mandamus to compel the clerk of the district court to certify to this court the "minutes of the trial," as kept by the reporter of the district court. The minutes of the court show that on the first day of the trial of this cause, the court appoints Charles F. Reynolds, Esq., reporter, to report the proceedings of this trial, and he is duly sworn according to law as such reporter."

Section 450 of the criminal practice act provides that the record of the action shall consist, among other things, of "A copy of the minutes of the trial." (1 Comp. Laws, 2075.)

It is claimed that the minutes kept by the reporter are the only minutes of the trial, and that in pursuance of the above section it was the duty of the clerk to include the same in "the record of the action."

The application for mandamus was denied, for the reason that in our judgment the legislature, in using the words "minutes of the trial," meant only the minutes as kept by the clerk, and recorded in the minute book containing the proceedings of trial that are daily read by the clerk and approved by the court. As to the correctness of this ruling there ought not to be any doubt or controversy; and if it was not for the fact that in *Gregory* v. *Frothingham* (1 Nev. 260), this question is referred to, in a dictum of the court, as being one upon which the court was divided in opinion, we should not be disposed to discuss it.

If, by the mere act of appointing a reporter to report the proceedings, the court adopts the notes kept by him as the minutes of the trial, as was argued by counsel, then we would have a record without any verification, save, perhaps, the certificate of the reporter. The court would have no power, after the notes were completed and filed, to correct or in any manner change the same. It would be the duty of the clerk to copy them in making up the record of the action after conviction, and without further verification they would be included in the transcript on appeal.

If the reporter kept notes of all the points raised by counsel and the rulings of the court thereon, as well as the testimony of the witnesses, as appears to have been done in

this case, then it would, if appellant's position is correct, be unnecessary to have any bill of exceptions, and the whole record would depend for its authenticity upon the reporter. The reporter would in fact be made superior to the district judge.

Such a practice would not only jeopardize the rights of every defendant in a criminal case, but it would lead to endless confusion and distrust, and would entirely destroy the certainty of legal records and defeat the very object for which they are made and kept.

If the statute warranted such a proceeding, it would be our duty to follow it; but it is evident that when the various sections of the criminal practice act are examined, it was the intention of the legislature to avoid, instead of to encourage or countenance such a loose, unsatisfactory and dangerous practice.

In *The State* v. *Huff, ante,* it is clearly intimated that the correct practice, if counsel desire to have the reporter's notes included in the record on appeal, is to insert them in the bill of exceptions, so that they can be identified and authenticated as the statute provides.

There is no provision of the statute that will authorize this court to review or examine the testimony, in a criminal case, unless it is embodied in a bill of exceptions. It is simply absurd to contend that the legislature meant to include the reporter's notes of the testimony as the "minutes of the trial."

Section 423 provides that: "A bill containing the exceptions must be settled and signed by the judge." (1 Comp. L., 2048.)

Section 424 provides that: "The bill of exceptions shall contain so much of the evidence only as is necessary to present the question of law upon which the exceptions were taken, and the judge shall, upon the settlement of the bill, whether agreed to by the parties or not, strike out evidence and other matters not material to the questions to be raised." (1 Comp. L., 2049.)

It is the duty of the district judge to examine the evidence in the bill of exceptions and to certify to its correct-

ness. In no other way can the evidence be authenticated so as to authorize this court to consider it. There is no law in this state authorizing the appointment of official reporters, nor any provision that requires a reporter when appointed to certify to the correctness of his notes; nor is there any provision that makes it the duty of the clerk to certify to the same. They can only be considered when adopted by the court as correct and included in a bill of exceptions settled and signed by the judge.

In California there is a law authorizing the appointment of official reporters, and it provides that his notes "shall always be taken as *prima facie* evidence of the testimony given upon any trial where such notes are taken," and the supreme court, in the *People* v. *Woods*, refused to consider the reporter's notes because they were not properly authenticated. Wallace, J., in delivering the opinion of the court, said: "In the record before us no statement of the evidence is contained in an authentic form. It is true, that the notes of evidence taken by the phonographic reporter are embodied in the transcript, and the certificate of the reporter is appended to the effect that they constitute a correct statement of the evidence, to the best of his knowledge and belief. But the act of 1867–8, 425, provides that the reporter's notes shall be taken as *prima facie* evidence only; that is, of course, that wherever presented they are open to question, and, possible, correction. This provision evidently refers to the proceedings to be had in the court below upon settlement of statements, allowance of bills of exceptions, etc. The record filed in this court, and upon which we proceed here, however, are not merely *prima facie*, but are conclusive in their character, and we have no means of correcting the notes of the reporter of the court below, or of entertaining an inquiry into their conformity with the facts actually occurring in that court. It results that the reporter's notes cannot be considered in this court." (43 Cal. 177.)

We shall now proceed to consider the various objections that were taken in the court below, and properly included in the record on appeal.

1. The indictment is in proper form. The objections thereto were virtually abandoned on the oral argument, and need no further notice.

2. The defendant moved the court to set aside the indictment on the ground that he was in custody of the sheriff, and confined in the county jail "under and by virtue of an order of the court to answer the charge of murder," and that he was not allowed the privilege of challenging the panel, or individual members of the grand jury. The facts as set forth in the bill of exceptions are as follows:

"The grand jury for the January term, 1876, of said court, was impaneled by the said court on the second day of February, A.D. 1876; that at the time of the impanelment of the said grand jury, the said defendant was not held to answer before the said grand jury for any offense whatever, but that in truth and in fact, an indictment had prior to the impanelment of said grand jury been found against said defendant for murder, by the grand jury of the October term, 1875, of said court, which said indictment was still pending against said defendant at the time of the impanelment of the said grand jury impaneled by the said court for the said January term, 1876, of the court; which said indictment was afterwards, to wit, on the twenty-first day of February, 1876, dismissed upon proper proof of the destruction thereof by fire.  *  *  *  That neither the said defendant, nor his counsel, nor any person in his behalf, has ever at any time asked, or demanded of this court the privilege of appearing before the said grand jury so impaneled as aforesaid, nor for an opportunity to challenge the panel or any individual member of the said grand jury; *  * or  *  *  ever at any time heretofore made any showing that the said defendant had in fact any ground of challenge to the panel of said grand jury, or to any individual member thereof; that at no time has this court ever refused such right, or privilege, to the said defendant, or any person in his behalf. The court, after duly considering the said motion, the facts and the premises, stated to the defendant and his counsel, that they could move to set aside the said indictment by taking any objection thereto that might have

been taken advantage of to the said grand jury or any member thereof, had the defendant appeared before said grand jury. No desire being so expressed either by said defendant, or his counsel, the court overruled said motion, and required the said defendant to plead to said indictment."

From these facts it appears that at the time the grand jury was impaneled defendant was not held to answer before it for any offense. He however had the privilege, under the ruling of the court, as well as by virtue of the provisions of section 276 of the criminal practice act, to move to set aside the indictment "on any ground which would have been good ground of challenge either to the panel or any individual grand juror." (1 Comp. L. 1900.) Having refused to exercise this privilege he is not in a position to complain of the ruling of the court. (*People* v. *Romero*, 18 Cal. 93.)

3. It is claimed that the court erred in allowing the challenge of the prosecution to the jurors, Klein, Taylor and Randolph, for implied bias in entertaining such conscientious opinions as would preclude their finding defendant guilty of murder in the first degree. Whether the answers given by these jurors were of such a nature as to actually disqualify them from serving as jurors, is a question that is not, under the provisions of our statute, subject to review. Section 421 of the criminal practice act provides that "exceptions may be taken by the defendant to a decision of the court upon a matter of law,   *  ·  *   *   in disallowing a challenge to the panel of the jury, or to an individual juror, for implied bias." (1 Comp. L. 2046.) The action of the court in *allowing* challenges for implied bias is not made the subject of an exception, and the reason why it was omitted as one of the grounds of an exception is correctly stated by the supreme court of California in *The People* v. *Murphy*, as follows: "The reason, and it is a sensible one, upon which the statute proceeds, is that when a competent jury, composed of the requisite number of persons, has been impaneled and sworn in the case, the purpose of the law in that respect has been accomplished, that, though in the impaneling of the jury one competent person be rejected,

yet if another competent person has been substituted in his stead, no injury has been done to the prisoner, certainly no injury which a new trial would repair, because even should a venire *de novo* be awarded, it is not pretended that the prisoner could insist upon the excluded person being specially returned upon the panel. The result would be that the prisoner would probably be tried again by another competent jury of which the excluded person would not be a member, and so the new trial would only be to do over again that which had been done already." (45 Cal. 143.)

4. The defendant interposed an objection to the ruling of the court in excusing the juror Wilson upon the ground that neither party challenged him. The record shows that this juror upon his *voire dire* testified that he was not a citizen of the United States. It is claimed by appellant's counsel that the court acted without there being one single fact before it to determine whether this testimony was true. The sworn statement of the juror was certainly *prima facie* sufficient to authorize the court to act. If the defendant entertained the belief that the juror was a citizen, the proper course for him to have pursued, would have been to propound such questions, or at least to have asked permission to do so, as would have presented the facts of the case to the court. The objection as made is wholly untenable. In the *State* v. *Kelly*, it was decided that, in cases of this kind, the court in the exercise of its sound discretion has the right of its own motion to discharge a juror at any time before he is sworn. (1 Nev. 227, and authorities there cited.) If there is an abuse of this discretion it might perhaps be subject to review, although there are but few cases reported where the judgment of the court has ever been disturbed upon this ground. The authorities all agree that for any good cause shown the court may, without challenge from either party, excuse a juror before he is sworn. (*People* v. *Arceo*, 32 Cal. 44; *Lewis* v. *State*, 9 S. &. M. 118; *McGuire* v. *State*, 37 Miss. 376; *State* v. *Marshall*, 8 Ala. 304; *Jesse* v. *State*, 20 Geo. 164; *Pierce* v. *State*, 13 N. H. 554; *Montague* v. *Commonwealth*, 10 Grat. 767; *Commonwealth* v. *Hayden*, 4

Gray, 19; *Stout* v. *Hyatt*, 13 Kansas, 241; *The Atlas Mining Company* v. *Johnston*, 23 Mich. 39.)

In *Commonwealth* v. *Hayden*, before the jury were impaneled, one of the jurors requested to be excused, because he lived in the same town with the defendant. The judge asked the juror whether he had formed or expressed any opinion in regard to the case, or had any interest or bias in relation thereto, and the juror answered he had not. The judge said that the reason assigned by the juror was not of itself a sufficient excuse, but, in the exercise of his discretion, directed the juror to leave the panel, and a supernumerary to take his place, and the supreme court held "that it was within the authority of the court, in its discretion, to excuse the juror for the reason assigned, although he was not legally incompetent to sit in the trial."

In *Stout* v. *Hyatt*, the court say: "It is not a substantial error for the district court to discharge a juror during the time the jury are being impaneled, although the juror may be discharged for an insufficient reason, where an unexceptionable jury is afterward obtained, and where the party complaining has not exhausted his peremptory challenges." If this right exists where the juror is free from all statutory disqualifications *a fortiori*, there cannot be any question as to the right of the court to act, in a case like the present, where the statute declares that the juror is disqualified. In such a case it is the duty of the district court to excuse the juror. There is no doubt but what a qualified juror may be rejected by the court, and still an impartial jury be obtained. Before the defendant can ask for a reversal upon this ground, he must show, as in other cases, that he has, in some manner, been prejudiced by the action of the court. (*State* v. *Raymond, ante.*) The true rule applicable to criminal as well as civil cases, is, in our judgment, clearly and correctly stated in the case of *The Atlas Mining Company* v. *Johnston*, as follows: "And though it would be ground of error for the court to admit a juror who is challenged, and ought to have been rejected, it is no ground of error for the court to be more cautious and strict in securing an impartial jury than the law actually required; and that for this

purpose the court may very properly reject a juror on a ground which would not be strictly sufficient to sustain a challenge for cause; or, in other words, when the refusal to sustain the challenge would not constitute error. So long as an impartial jury is obtained, neither party has a right to complain of this course by the court; and especially when, as in this case, no objection was taken by either party to the competency or impartiality of the jury which was obtained."

5. It is claimed that the court erred in allowing testimony as to the intimate and illicit relations existing between the witness Nellie Sayers and the deceased; also, as to the same relations between this witness and the defendant. "An evil motive," says Mr. Wills in his work on Circumstantial Evidence, "constitutes in law as in morals, the essence of guilt; and the existence of an inducing motive for the voluntary acts of a rational agent is assumed as naturally as secondary causes are concluded to exist for material phenomena. The predominant desires of the mind are invariably followed by corresponding volitions and actions. It is therefore indispensable, in the investigation of moral actions, to look at all the surrounding circumstances which connect the supposed actor with other persons and things, and may have influenced his motives." (38.) The prosecution had the right to offer any evidence which tended to prove a motive in defendant for the commission of the crime, and this testimony was clearly admissible for that purpose. (*State* v. *Watkins,* 9 Conn. 52; *State* v. *Green,* 35 Conn. 203; *Johnson* v. *State,* 17 Ala. 625–6; *State* v. *Rash,* 34 N. C. 382.)

6. The court did not err in refusing to strike out the evidence of the witness Nellie Sayers. It is true, as was argued by counsel for appellant, that the full, free, and complete cross-examination of a witness is one of the unquestionable rights that every defendant and every litigant is entitled to. A thorough cross-examination is perhaps the most efficacious test which the wisdom of the law has ever devised in order to discover the truth. It is not contended, however, that this right was in any manner

abridged, or denied, by the court. In fact the record affirmatively shows that the court used every means within its power to aid and assist the counsel in securing this right. It was claimed that this witness testified before a coroner's jury to an entirely different state of facts from what she testified to at the trial. Her testimony, before the coroner's jury, as was claimed, tended to show that defendant did not commit the crime. Her testimony at the trial tended very strongly to prove that the defendant was the guilty party. Upon cross-examination she refused to answer some of the questions asked by defendant's counsel as to whether she had or had not testified to certain facts before the coroner's jury, giving as an excuse for not answering that she was so intoxicated when before the coroner's jury, that she did not know what she there testified to. She claimed to be perfectly oblivious of everything that transpired before the coroner's jury. At the close of her examination defendant's counsel moved the court to strike out her testimony, because she had refused to answer the questions propounded upon cross-examination. In overruling this motion the court, in the presence of the jury, said: "I think the witness has answered all the questions, with the exception of some few matters as to her impeachment, and so far as that is concerned, I will relax the rule whenever it is desired to impeach her; but I shall refuse to strike out the evidence. If you desire to introduce this matter in defense in contradiction of the witness, I will allow you to introduce it the same as if she had answered directly." The court would certainly have erred had it granted the motion. The witness being competent to testify her credibility was a question solely for the jury to decide. The fact that the court offered to relax the rule and allow the defendant to impeach the witness the same as if the proper foundation had been laid, did not have any tendency to prejudice the rights of the defendant; nor is there anything in the remarks made by the court in overruling defendant's motion that could possibly have had any such tendency. The defendant did not avail himself of the privilege to offer any testimony to directly impeach

the witness. Her testimony was properly submitted to the jury for what it was worth. (*Jones* v. *Gammons, ante.*)

7. It is contended that the court erred in refusing to give this instruction: "The jury can draw no inference of guilt from the fact that the pistol in question was and is the property of the prisoner, if other persons had access to and might have had the possession of, or used the said pistol; nor from the fact that the pistol was found in the prisoner's bedroom, if other persons had access to, or might have had access to, the bedroom after the shooting was done." Waiving, for the nonce, the question of the absence from the record of all testimony tending to show the applicability of this instruction, and assuming that there was testimony offered at the trial which would have warranted an instruction upon this point, it is evident that the court did not err in refusing this instruction. The fact that the pistol belonged to defendant and that it was found in defendant's bedroom shortly after the homicide, tended to establish one link in the chain of circumstantial evidence, and the court was not authorized to withdraw its consideration from the jury. The fact that other parties had access to defendant's bedroom might have a tendency to weaken the force of this link in the chain of evidence, but it would not, of itself, destroy it.

8. It is next claimed that the court erred in refusing to give the following instruction, asked by defendant's counsel: "The jury may, and it is their duty to, take into consideration, the chastity, or want of chastity of any witness for the state, in determining the credibility due such witness." This instruction is not confined to any particular witness. It was, as we think, intended to mislead the jury, and was properly refused. It tells the jury, in effect, that want of chastity is sufficient to destroy the credibility of a witness. As a general proposition, to be applied indiscriminately to all cases, this is not true. A witness may be unchaste and yet be truthful. A witness may be chaste and yet be untruthful. The law affords ample remedies for testing the credibility of witnesses, without introducing testimony of specific acts of immorality, and in particular instances allows greater latitude than in others, owing to the special

facts and circumstances that surround each individual case. There are perhaps exceptional cases where it might be proper to show the utter depravity of the moral character of a witness in order to establish the fact that such a witness is not entitled to any credit. But we are not dealing with the exceptions. The general rule, as recognized by a majority of the decided cases, is that evidence of bad character for chastity, where such character is collaterally, not directly in issue, is not admissible for the purpose of impeaching the credibility of a witness. (*People* v. *Islas*, 27 Cal. 630; *Gilchrist* v. *M'Kee*, 4 Watts, 380; *Jackson* v. *Lewis*, 13 Johns. 505; *Bakeman* v. *Rose*, 14 Wend. 110; *Ford* v. *Jones*, 62 Barb. 484; *Spears* v. *Forrest*, 15 Vt. 435; *Kilburn* v. *Mullen*, 22 Iowa, 502; *Rudsill* v. *Slingerland*, 18 Minn. 381.

We decided in the *State* v. *Huff*, *ante*, that "no legitimate influence of the untruthfulness of a witness can be drawn from the fact that he has been convicted of frequent assaults and batteries. It could be inferred that he was a violent-tempered, and, perhaps, a dangerous man, but not that he was a liar." The same general principle applies to all cases. A man may be so incontinent as to destroy his reputation for chastity, and yet retain a scrupulous regard for truth. Want of chastity, in many instances, might include a want of veracity; but, it must be admitted, that this is not always so. It is only with the witness's character for truth and veracity with which the jury have to deal. A witness, although unchaste, is entitled to credit if the jury are convinced that his, or her testimony is true. A witness, although chaste, is not entitled to credit if the jury are convinced that his, or her, testimony is false. "The only object in inquiring into the character of a witness," as was said in *Rudsill* v. *Slingerland*, "is to ascertain whether his statements, in themselves, are entitled to credit; if he is a truthful person, they are; otherwise they are not. A witness, therefore, in coming into court, would, perhaps, properly be considered as asserting his character for truthfulness to be good, and be charged with notice to defend it; but we are unable to see why a witness should be held responsible to answer for, or be required to meet an attack upon his

character in any other respect. A man may indulge in vices which destroy his general character, yet his truthfulness, and his reputation for truthfulness, may be unimpeachable. An inquiry in such a case as to his moral character would mislead, instead of assist, in arriving at the object of investigation, namely, his credibility; it would, in any event, be an unnecessary attack and exposure of him to contempt and disgrace. Further, by such general inquiry as to character, the administration of justice would be hindered and delayed by collateral issues, and be more easily made the channel of venting private hatred and malice. For these, among other reasons, we think the better general rule is, that in impeaching the character of a witness in this mode, the inquiry in chief must be restricted to his credibility; that is, his general reputation for truth and veracity. Before passing from this point we deem it proper, in general terms, to state, that upon an examination of the record it will be found that the jury were very fully instructed with reference to their duties in determining the credibility of the witnesses introduced upon the part of the state, and that it is apparent therefrom that defendant has no ground of complaint against the court upon this point. At defendant's request, the jury were instructed that it was their duty to take into consideration the previous statements under oath, or otherwise, in regard to the facts testified to by them, the sobriety, or want of sobriety, any bad will or ill feeling, upon the part of said witnesses in determining their credibility. Another instruction reads as follows: "The jury are the exclusive judges of the credibility of the witnesses, and if the witnesses, any one or all, who testified for the state are of such a character, or if they have been so impeached as to create a reasonable doubt in the minds of the jury as to the guilt of the defendant, they will give that doubt to the prisoner."

9. The last objection is presented by the affidavits made by the defendant and by his counsel. It is alleged in the affidavit made by defendant's counsel that during the closing argument of the district attorney, "the court-room was crowded to its fullest capacity with spectators, both seated

and standing, and, as affiant is informed and believes, the greater portion of the same were fairly intoxicated with excitement and prejudice against the said defendant, and that during the said argument of the said district attorney, the said crowd standing near the said jury, cheered the said district attorney by the clapping of hands and stamping the floor and the benches, similar to the demonstrations usually had at political meetings; that no steps were taken at the time by the court, or any of its officers to punish any of the persons so disturbing and interfering with the proceedings of the said trial, but the said district attorney did very much after the style of Marc Anthony make an appeal to the excited crowd and *begged them* not to cheer him any more." The affidavit of the defendant was substantially to the same effect.     Upon the presentation of these affidavits the defendant asked the court to grant him a new trial, and it is claimed the court erred in refusing to do so.     The prosecution upon this point presented the affidavits of Robert H. Lindsay, district attorney; Thomas E. Kelley, sheriff; H. C. Thompson, deputy clerk; and Charles F. Reynolds, reporter, each of whom stated that he was present during the whole of the trial of said case, that the whole trial was conducted with the usual and proper dignity and decorum, "that during the closing argument of the district attorney the spectators in the court-room once, and only once, evinced a desire to applaud some of the remarks of the district attorney, when the court immediately and peremptorily suppressed the same, and there was no further manifestation of feeling whatever on the part of the said spectators during any time of the said trial."     Without commenting on the language used in the affidavit of counsel for defendant, it must, in this case, suffice for us to say, that the counter-affidavits presented by the prosecution clearly establish sufficient facts to warrant us in coming to the conclusion that nothing transpired during the closing argument of the district attorney that improperly prejudiced defendant's case or prevented him in any manner from having a fair and impartial trial.     The court did not err in refusing to grant a

new trial. The judgment and orders appealed from are affirmed, and the district court is directed to fix a day for carrying its sentence into execution.