Syllabus.

[No. 1558.]

## M. D. HART v. THE STATE.

1. GRAND JURY.—CHALLENGE TO THE ARRAY of grand jurors who presented the indictment was based on the ground that there was no record of the appointment of the jury commissioners by whom the grand jurors were drawn. Over objection by the defense, the trial court received evidence of the fact that the jury commissioners were duly appointed, and that the failure of the minutes to show that fact was mere inadvertence; and the challenge to the array was overruled. *Held*, that the challenge was correctly overruled. The array of an impanelled grand jury cannot be challenged or impeached on any other grounds than the two prescribed by Article 380 of the Code of Criminal Procedure.

2. SAME.—Article 377 of the Code of Criminal Procedure provides that "any person, before the grand jury have been impanelled, may challenge the array of jurors or any person presented as a grand juror, and in no other way shall objections to the qualifications and legality of the grand jury be heard. Any person confined in jail in the county shall, upon his request, be brought into court to make such challenge." The right thus conferred is limited to the time prescribed and the causes specified, and is not available to a prisoner in the county jail who failed to request that he be brought into court for the purpose of making the challenge.

3. POSTPONEMENT OF TRIAL.—That the names of the State's witnesses, as they appeared on the indictment, were not indorsed on the copy served upon the accused, affords him no ground to demand a postponement of the trial until he be served with a copy so indorsed.

4. MURDER—EVIDENCE.—In the trial of a party charged with murder, it was not error to admit as evidence against him the deposition of the deceased, taken at an examining trial of the accused for an assault with intent to kill, there being proof that the wounds inflicted by the accused in the assault were an efficient cause for the subsequent death of the deceased.

5. EXAMINING COURTS—JURISDICTION OF JUSTICES OF THE PEACE.—The ordinary jurisdiction of a justice of the peace is circumscribed by the limits of his own precinct; but when a justice of the peace holds an examining court to inquire into the commission of an offense, his judicial authority is co-extensive with his county.

6. EVIDENCE.—A statement made to a witness by a third party, in the absence of the defendant and the deceased, was properly excluded as evidence, being *res inter alios acta*.

7. SAME—MOTIVE—INTENT.—When the issue involves the motive or intent of the accused, the State may prove against him extrinsic facts which tend to show motive or intent on his part to commit the inculpatory act in issue. In a trial for murder, therefore, the State was properly allowed to put in evidence an indictment which charged the defendant with an assault with intent to murder the deceased two years before the deceased was killed.

Syllabus.

8. EVIDENCE—CLOTHES OF DECEASED.—In a trial for murder alleged to have been committed by shooting, it was not error to allow the prosecution, over objection by defense, to put in evidence the clothes worn by the deceased at the time he was shot, and to exhibit the shot holes in them. To this proof it was not a valid objection that the clothes could not be "sent up in the record." See the opinion *in extenso* upon this ruling.

9. DECLARATIONS OF ACCUSED.—The rule which excludes uncautioned confessions made under arrest does not apply to statements made to an officer by the accused before he was arrested and when he was not apprised that the officer intended to arrest him. The actual intention of the officer at the time is immaterial.

10. EVIDENCE.—Indications of a consciousness of guilt by a person accused or suspected of crime, or one who in consequence of such indications is suspected or accused of crime, may be proved as evidence against him. No limit to the number of such indications can be assigned, nor can their nature or character be theoretically defined. However numerous or minute they may be, they are admissible if they tend to elucidate the transaction in question.

11. MURDER—CHARGE OF THE COURT.—In a trial for murder the court below charged the jury as follows: "Homicide is the destruction of the life of one human being by the act, procurement, or culpable omission of another. The destruction of life must be complete by such act or agency. But, although the injury which caused death might not, under other circumstances have proved fatal, yet if such injury be the cause of death, without its appearing that there has been any great neglect or manifest improper treatment by some other person, such as a physician, nurse or other attendant, it would be homicide; and if the jury are satisfied from the evidence that some one shot the deceased and inflicted upon him a wound which was not in itself necessarily mortal, and that the wound inflicted produced blood poisoning, or any other effect which would result in the death of the deceased, the party inflicting the injury would be as guilty as if the wound would of itself inevitably lead to death." *Held*, correct, and in harmony with the statute upon the subject. (See Penal Code, Arts. 546, 547, 548.)

11 SAME—CIRCUMSTANTIAL EVIDENCE.—The law governing circumstantial evidence should not be charged except in cases where the State relies upon that character of evidence to obtain a conviction.

12. EVIDENCE—PRACTICE.—That proof to the effect that a "third party had malice towards the deceased, a motive to take his life and the opportunity to do so, and had threatened to do so, is not admissible in behalf of one accused of murder," is not the rule which now obtains in Texas, and especially when that third party was a prosecuting witness who was shown to have been at enmity with the deceased, had threatened his life, had carried weapons for him, and who, at the time of the homicide, by his proximity to the place of the crime, might himself have committed the deed. A State's witness having testified to strong inculpatory facts against the defendant, the defense, after laying the proper predicate, proposed, by impeaching testimony, and by a cross-examination, to dis-

---

---

close a motive on the part of the witness to kill the deceased, together with his repeated threats to do so,. and contradictory statements by the witness concerning the killing. Note the opinion for a state of case wherein it is *held* that the court below erred in refusing to permit the defendant to make the proposed proof if he could, and in the manner proposed. See the opinion also for the questions directed to that purpose, and erroneously disallowed, and for an elucidation of the ruling.

13. Same.—It was not error, in a murder trial, to refuse to compel a State's witness to name the friends of the defendant of whom he testified he was afraid, and to whom, as he testified, he told different stories concerning his knowledge of the defendant's complicity in the homicide. Nor was it error to permit the witness to testify that he was induced to tell these different stories by reason of his fear of the defendant's friends.

Appeal from the District Court of Hunt. Tried below before the Hon. G. J. Clark.

On Saturday, the ninth day of December, 1882, Doctor W. R. Skinner, a practicing physician and a resident of Hunt county, was called from his .home to attend a patient who lived a few miles distant. Late the same evening he returned to his home, bearing on his person several gun shot wounds, which he said he had received while crossing a bridge on his homeward way. These wounds were not immediately fatal, but, according to the medical testimony, they caused pyæmia or blood poisoning, and thereby, on the eleventh day after they were inflicted, resulted in the death of the wounded man. After they were inflicted, and before their fatal result, the appellant (who is styled M. D. Hart in the indictment, but usually called "Mart. Hart" in the testimony) was arrested on the charge of an assault with intent to murder Doctor Skinner, and an examining trial upon that charge was held by a justice of the peace whose precinct adjoined that in which the shooting was done. On that trial the testimony of Doctor Skinner was taken and reduced to writing. Its admission on the appellant's trial for the murder of Skinner raised some of the questions raised on this appeal.

On January 5, 1883, the grand jury of Hunt county presented an indictment charging the appellant with the murder of Skinner, on the ninth of the preceding December, by shooting him with a gun. On the fourteenth of the same month a trial was had, and appellant was convicted of murder in the first degree. The jury fixed a life term in the penitentiary as his punishment. Being refused a new trial, he appealed.

Wiley Murphy was the first witness for the State. He testi-

fied that he lived eight or nine miles southwest from Greenville, in Hunt county, on Caddo creek, and about one and a half or two miles southwest from a bridge on the Greenville and Terrell road. The witness's mother was taken sick on the evening of Saturday, December 9, 1882, and at about one o'clock he went for Doctor W. R. Skinner, the deceased. He reached Doctor Skinner's between two and half-past two o'clock, the distance being about four miles, and the road from one house to the other leading over the bridge. Doctor Skinner did not return along with the witness; the witness traveling on horseback, and he in a buggy. The witness met no one going to or returning from Doctor Skinner's, but at the Van Sickle's postoffice he saw Sam. Van Sickle, who had charge of the office, and told him who he had been for, and for what purpose. Doctor Skinner left the witness's house, on his return to his home, that evening about five o'clock—perhaps five or ten minutes later. He was then well, except that he was complaining of a slight pain in his back. He was not shot when he left the witness's house, but was shot during that evening. The bridge, the houses of the witness and Doctor Skinner, and all of the intermediate road, are in Hunt county, Texas. One traveling the road between these two houses would have to let down one pair of bars consisting of two poles.

James Husbands testified, for the State, that he lived about ten miles southwest from Greenville, and from two to two and a half miles from the bridge over Caddo creek, and about three-quarters of a mile a little east of south from Wiley Murphy's. He remembered the shooting of Doctor Skinner, but not the day on which it occurred. The defendant came to witness's house on that day about eleven o'clock, ate dinner with the witness, and later, with the witness, rode around a tract of land he owned, which the witness was talking of buying. Returning from this trip around the land, they came to a point about a quarter of a mile from the witness's house, stopped, talked a while, and there parted, the defendant going toward his house, and the witness toward home. The sun was then about an hour or an hour and a half high. Defendant rode a dark pony horse, and wore a yellow oil "slicker" coat. Dave Pitts, Ward, Tredway, Miles Van Sickle, Mrs. Mitchell and Durham lived between where witness and defendant parted and the bridge.

Cross-examined, the witness stated that the bridge was on the Greenville and Terrell road. The Van Sickle postoffice is the

first house south of the bridge. Mrs. Mitchell lived a quarter of
a mile west of the Greenville road. Ben. A. Van Sickle lived
three quarters of a mile or more southeast from Miles Van
Sickle's place, which is the postoffice, and one mile and three-
quarters a little east of south from the bridge. The land which
the witness and defendant had looked at lay in the fork of Elm
and Big Caddo creeks, and a little west of south of the witness's
house. Witness, Ben. A. and Miles Van Sickle lived between
Big and Little Caddo. Witness and defendant parted west of
the Terrell road, and over two miles distant from Ben. A. Van
Sickle's. To run a line from the bridge to this point, it would
be a half mile east to B. A. Van Sickle's. Rube Smith lived
on a neighborhood road that led into the main Terrell road op-
posite B. A. Van Sickle's. Traveling that road, defendant
would have had to pass Rube Smith's and Dave Pitts's, who
lived on John Pierce's place, a little south of Lee Pierce. His
route to B. A. Van Sickle's would have been to the Terrell road
by Rube Smith's and Dave Pitts's. From the point where the
neighborhood road entered the Terrell road it is one and a half
miles to the bridge, the road passing near the Van Sickle post-
office, within a half mile. It was two miles to the bridge from
where witness and defendant parted. The defendant had no
arms about him that the witness saw. He certainly had no gun
while with witness. When the witness and the defendant
parted, another party was coming toward the defendant in a
gallop. Witness and defendant had just inquired for Turner
Ussery at Ussery's house, and found he was not at home, and
when witness saw the man coming he said to defendant: "Yon-
der is Ussery, now," and defendant went off in a trot and met
the man about one hundred and forty yards distant. Witness
did not know the man.

John Williams testified, for the State, that he saw the defen-
dant two or three minutes after he and Jim Husbands (the last
witness) separated on the evening that Doctor Skinner was shot.
They had some talk about some logs the witness had bought
from Jim Hale, some of which, the defendant claimed, grew on
his land. The witness did not remember how it came up, but in
the subsequent conversation he remarked that Mrs. Murphy was
very sick, and the defendant asked if any one had gone for the
doctor. Witness replied that Wiley Murphy had gone, and the
defendant asked what doctor he had gone for. The witness re-
plied that he had gone for Doctor Skinner, and defendant asked

witness if he knew what time the doctor would get to Murphy's. Witness replied that he might be there then, or on the way, whereupon the defendant left in a gallop toward Van Sickle's. The sun was then near or quite two hours high. The defendant then lived somewhere near Van Sickle's, the witness did not know exactly where. From the place of this conversation to the bridge, the distance was two miles, thence a mile and a half or two miles to Van Sickle's. From where the witness and defendant met to Van Sickle's the distance was one mile. Van Sickle lived between there and the bridge. Defendant wore a yellow oil slicker, and rode a black pony. He talked but a very short time after witness told him Doctor Skinner had been sent for.

The cross-examination of this witness was close and searching, but developed little of interest beyond the fact that the witness, according to his statement, met Wiley Murphy at the Van Sickle's postoffice, and from him learned that he was going after Doctor Skinner. When he met the defendant, at the time of the conversation deposed to, defendant had no gun. One purpose of the cross-examination appeared to be to show feeling on part of the witness against the defendant. The witness denied that he told Levi Warren to go before the grand jury and swear all he could against the defendant. He saw no one but defendant at the place of the meeting. Witness did not pass Jim Husband's house. He saw York Hunnicutt leaning against the fence at the house of a negress named Harriet, who lived where R. Smith lived. Hunnicutt had no jug.

York Hunnicutt testified, for the State, that he lived on the old Darling place, about a mile and a half from Wiley Murphy's, and about a half or three-quarters of a mile from the bridge. Witness saw the defendant about an hour and a half by sun on the day of the shooting, below the Pierce field, near Jim Husband's, and west of the Terrell road. He was riding a black pony in a gallop, and wore a slicker overcoat. He passed the witness in the road, both going the same way, and said "howdy" to the witness as he passed. Witness had previously seen him on that day at Jim Husband's. Witness got home that evening a little after sundown, and remained all night. He heard the report of a gun about a quarter or half hour after he got home, between his house and the bridge, or at the ford or bridge. It was a very loud report. It was not then to say dark; one could see tolerably well. Witness heard two shots that night, but only one at that time. Between that Saturday evening and the death of

Doctor Skinner, the witness saw the defendant at Harriet Ward's, where the witness and Bill Ward were picking cotton    Defendant did not enter the field, but witness and Bill were near the ends of the row.    He asked Bill Ward if he heard the report of a gun on that Saturday evening (December 9), and Bill said that he did.    He then asked Bill if it was dark at the time, and Bill replied that he did not think it was quite dark.    Witness did not remember that Bill did or did not tell defendant where he was at the time.    According to the recollection of the witness, the defendant asked him what time he (witness) thought it was when the gun fired.

The defense subjected this witness to a very rigid cross-examination.    He stated that when he was at Husband's house, at twelve o'clock on that Saturday, Mr. Husband, his family, the defendant, and a girl from Mitchell's, were there.    Witness got a half gallon of molasses at Husband's and took it home, going by Harriet Ward's, where he got his dinner, with Harriet, R. Smith and the children.    He left Harriet's about one hour and a half by sun.    While at Harriet's he saw John Williams pass, and he was two or three hundred yards from Harriet's, on foot, when the defendant passed him on the road.    He was then on the Terrell road near the Pierce place.    Before he got to the Terrell road he stopped at Dave Pitts's, on the John Pierce place.    Aunt Harriet, her daughter, Mrs. Pitts, and the children were there.    After sitting there awhile he started on and met Dave Pitts, and talked with him.    He then went on toward the post-office, and saw Levi Warren on the prairie, about a half mile from Van Sickle's house.    Levi was then a considerable distance off, had a rifle, and seemed to be in the act of shooting a rabbit, but witness did not hear him shoot.    He saw Levi again, near Van Sickle's house, but did not speak, though he was close to him.    Witness went on home and got there before good dark, and heard the shot down about the bridge, a half or three-quarters of a mile off, within a quarter or half an hour.    The bridge could not be seen from where witness lived.    The bridge was near a hundred feet long. and is level only at the top; is a little higher on one side, and slopes on the south.    The centre is two or three feet higher than the south bank.    On the south side of the bridge there is a kind of second bank, as large as a couple of chairs or larger.    Just above and on the south side there is small brush which reaches within a few feet of the bridge.    Beyond the brush, on the south bank of the creek, is a glade;

about a hundred yards beyond is a drain, and there the roads fork, the left hand, going by the postoffice, is the Terrell road; the right hand goes by witness's house, and Wiley Murphy's. Before the defendant had the conversation with witness and Bill Ward, testified to, the witness had heard that the defendant had been arrested and was on bond. Jeff. Mason came to the cotton patch at that time, and went off with defendant. Witness did not see Mason when defendant commenced talking with him.

Mrs. W. R. Skinner, the surviving widow of the deceased, testified, for the State, that between three and four o'clock p. m., on Saturday, December 9, 1882, Doctor Skinner was called to see Mrs. Murphy, who was reported very sick. He left, traveling, as was his custom, in a two horse buggy, and in as good health as was usual to him. He had never been in robust health. He returned about twilight. Witness was then at supper, and one of her little daughters went to open the gate for him; and then he told her to call Medes Griffin, as he had been shot. He was assisted out of his buggy by Medes Griffin, his son Bob, and others of the family. Medes and Bob assisted him into his room, when he sat down, and witness took off his clothes. He wore his ordinary or usual suit and an overcoat, and was bleeding profusely from wounds above the knee and in the wrist and arm. Mack Hale and Bob, the witness's son, went to Greenville for Doctors Garrett and Milner, and returned with them in about an hour and a half. Doctor Skinner was shot on December 9, 1882, and died on the Thursday before Christmas. He was attended during that time by no physicians except Doctors Garrett and Milner. Doctor Goodloe called one day, and went into Doctor Skinner's room to see him. The witness identified the clothing worn by deceased on the evening that he was shot, and the rug which he then used in his buggy.

Doctor J. W. Garrett testified that, together with Doctor Milner, he was called to see Doctor Skinner on December 9, 1882, and reached his house about 9:30 o'clock p. m., and found him suffering from gun shot wounds. He was in pain and somewhat shocked, but was recovering from the shock. One shot went through the wrist joint of the left arm; one struck about three inches above the first on the same arm, and the third was a flesh wound, an inch or so above the left knee. Witness again visited him, with Doctor Milner, on Monday, and found him in much pain. In all, witness paid him four visits. He found Doctor Skinner, on the day before

14

he died, in a very critical condition. His temperature was below normal; his mind was clear, but almost prostrated. His death was caused by secondary effects of the wounds—blood poisoning. Pyæmia might set up in forty-eight hours, when suppuration sets in. Doctor Skinner died on the eleventh day after he was shot, his death being indirectly caused by the wounds. The clothes of the deceased being exhibited, the witness testified that the balls entered them from the left of the deceased.

On cross-examination, the witness said that, from the range of the balls, he could not tell the position of the party inflicting the wounds relative to the deceased, unless he knew the attitude or position of the deceased when shot. The party firing in this instance might have been a little lower than the deceased, or they might have been on level. The upper shot in the left arm broke the larger bone. The shot in the leg amounted to but little. The witness regarded the wounds as serious and painful, but not as mortal. No pyæmia had set in on Monday. On the day before he died, Doctor Skinner complained of pain in his stomach and bowels. At the time of the examining trial of the defendant, the condition of deceased was as favorable as at any time during his illness. Up to and at the time of the examining trial, it was the opinion of the witness that the wounds would not prove fatal. Profuse perspiration is one of the marked indications of blood poisoning. Gun shot wounds and supervening blood poisoning caused the death of Doctor Skinner, in the opinion of the witness.

The testimony of Doctor Milner, for the State, was substantially the same as that of Doctor Garnett.

The State next introduced the testimony of Doctor W. R. Skinner, which had been reduced to writing at the examining trial of the appellant upon a charge of assault to murder the deceased. It reads as follows:

"My name is W. R. Skinner. I am acquainted with M. D. Hart, the defendant in this case. (Witness points defendant out in court.) I have known the defendant for about seven years. I saw the defendant on or about the ninth of this month—on Saturday evening last, which was the ninth day of this month. I had been called to see Mrs. Murphy, who was sick. She lived across Caddo, about four miles south of west from my house. I left home about three o'clock to go there. I left Mrs. Murphy's about sundown—it might have been a little after sundown. I was in a buggy. I drove very fast, as I knew the roads were

very bad in the bottoms of Farber and Caddo creeks. I met a man in the road directly after I left Mrs. Murphy's. He asked me about Mrs. Murphy's condition, and I talked with him a moment or two, and then drove on very fast. I don't think I was more than ten or fifteen minutes going from Mrs. Murphy's to Caddo bridge, north of Van Sickle's, on the Greenville and Terrell road. My horses are always free to cross the bridge, but as I drove upon the bridge they began to shy and grow restless as if they saw something or were scared. I looked and saw Mart. Hart, the defendant, on the second bank of the creek, in a stooped position with a gun in his hands, and about the time I saw him, he, defendant, shot me. I did not have time to arrange the lines in my hands from the time I saw him until he shot. When he fired at me, he shot me in the thigh, above the knee in the leg, and in the arm. Several bullets lodged in my clothes. Defendant was on the left of me when he shot, and was also on the left of the bridge. The defendant was not more than ten or twelve feet from me when he shot. I had no trouble to see the party who did the shooting, and I know the defendant is the man. All this occurred in Hunt county, Texas."

(Crossed by the defendant): "The defendant was on the other side of the creek from here. Defendant was not down in the bed of the creek, nor on the main bank, but was on what I call a second bank of the creek, or on the side of the bank. This bridge is near two miles from Mrs. Murphy's. Mrs. Murphy lives about a mile and a half or two miles from Shamberger's gin, and south of it, or a little west of south of it. I never saw any one but defendant at the bridge. I heard some parties talking before I got to the creek. I think a man can stand on the bank I have mentioned. I don't think it would be too steep for him to do so. I don't think defendant was more than ten or twelve feet from me. I did not have to look back to see defendant when I drove on the bridge. He was to my left. The man I met was about a half mile from Mrs. Murphy's. I came by Hunnicutt's. I could have seen people distinctly when I passed Hunnicutt's. Defendant was dressed in the garb he generally goes in, I think, but I did not notice and cannot say just what kind of clothes he had on."

(Re-examined): "It was sufficiently light for me to see and make out who the defendant was, and my especial attention was directed to see who the party was, and I did not notice his clothing. My buggy did not have gun shots in it before I passed the

bridge.    The defendant shot me with a double barreled shot gun
—or at least it looked like a double barreled shot gun to me.

                                         "W. R. SKINNER."

County Attorney Stinson, who represented the State on the
examining trial, testified, for the State, that the above evidence
related to the same transaction as that for which the defendant
stands indicted.    The proceedings against the defendant in that
examining trial were for the wounds inflicted on Doctor Skinner
on December 9, 1882, and the same for which the defendant was
now on trial.

Perry Houk testified, for the State, that in July, 1882, he had
a conversation with the defendant in which Doctor Skinner's
name was mentioned.    The defendant and witness were going
home from Greenville at the time.    Both he and defendant had
been indicted by Doctor Skinner.    Defendant said to witness:
"We must get Skinner out of the way before the January term
of the court."    Witness asked "Why," and the defendant re-
plied: "To beat our cases."    Defendant then said to witness:
"John Houk's wife is confined across the creek; there is brush
across the creek, and that will be a good place to shoot him from.
I don't reckon two hundred and fifty dollars would get you to do
it?".    Witness replied: "No, nor a thousand."    Defendant then
said that he had a good shot gun.    Witness was with the de-
fendant when, upon his examining trial, the latter was released
on bond, and the defendant told the witness to keep his mouth
shut—nothing more.

On cross-examination the witness stated that he lived nine
miles south of Greenville, where he had lived the greater part of
his life.    Witness left the county of Hunt in July, and was gone
until March two years ago, when he was brought back from
Falls county by the deputy sheriff, charged with theft of prop·
erty belonging to Doctor Skinner.    His only trial upon this
charge of theft resulted in a mistrial.    There were other wit-
nesses in the case besides Doctor Skinner, but witness could not
say what their testimony would amount to on a trial.    Since
that mistrial, and during the present term of the court, the case
against the defendant had been dismissed.    Witness had told
various parties what he would testify.    He had told different
tales about it, but could not say how many.    Witness denied
that he had told Mrs. Goodloe that he had been telling that de-
fendant had offered him two hundred and fifty dollars to kill the

deceased, and that it was not true, and that he would not so swear.   He did not tell Schrympsher that he had been before the grand jury but was not asked about the two hundred and fifty dollar matter, which was not true, and to which he, witness, would not swear in open court.   Witness did not tell him that he was glad that Skinner was dead, and that Skinner ought to have died when a boy.   He did not tell Schrympsher that he had heard that the defendant's friends were trying to fasten the killing on him, and that if it came to swearing lies, he, witness, could swear lies too.   Referring to the matter in a conversation with Schrympsher, witness told him that he would swear nothing but the truth.   Witness denied that he told Lawson that he, witness, had been telling the two hundred and fifty dollar story in order to get his own case off the docket, and because defendant's friends were trying to fasten the killing on him.   Witness told Mrs. Goodloe that he had understood she had told what Doctor Goodloe had reported him, witness, to have said, and that, in fact, he had told Doctor Goodloe nothing about it. Schrympsher told witness that he had understood witness had been before the grand jury.   Witness told him that he had not been before the grand jury.   The opinion discloses the remaining progress of the cross-examination.

J. W. Dagget testified, for the State, that seven months before the killing, in the course of a conversation with the defendant regarding his difficulty with Doctor Skinner, witness said to him: "You ought to settle this thing."   Defendant replied: "D—n him, if I can get him in the right place I will settle with him." Witness did not tell of this conversation until after the killing. This conversation occurred in defendant's sewing machine wagon.   He was then in the machine business.

The State next introduced in evidence an indictment filed on the twentieth day of January, 1881, charging the defendant with an assault with intent to murder Dr. Skinner, on the sixth day of December, 1880.

The substance of the testimony of Mrs. Mitchell, for the State, was that she lived about a half mile from the bridge.   Between sundown and dark, on the Saturday in question, she heard the report of a gun down about the bridge.   She saw neither the defendant nor the deceased that day.   Warren had got home before she heard the shooting, and Husbands left her house just before sundown.   She saw no one else that she remembered,

though she took no notice of the road, and others might have passed.

Bill Ward testified, for the State, that he was near the bridge (about a hundred yards west), and heard the shooting, and then heard a buggy or wagon run across the bridge. M. Clayton was with witness. The report of the gun was very loud. Witness knew nothing of his own knowledge about a gun being found. Witness then corroborated the witness Hunnicutt in regard to the subsequent conversation with defendant at the cotton patch fence of Harriet Ward, adding that defendant asked him if he saw any one at the bridge, and that he answered in the negative. It was not good dark when the shot was fired, and the witness thought he could have recognized a person at a distance of twenty-five or thirty steps.

The cross-examination of this witness, which was close and incisive, disclosed that he and Clayton, who were traveling in an ox wagon, had crossed the bridge without incident of any kind, and without seeing any one, or noticing anything unusual about it, about three minutes before the witness heard the report of the gun, and in that time they had gone about one hundred yards, where they had stopped for Clayton to get a drink. The State closed.

Mrs. N. Goodloe testified, for the defense, that a short time before this trial, Perry Houk was at her house, and that she had a conversation with him. Perry Houk said, in that conversation, that it was not true that the defendant had ever offered to hire him to kill Doctor Skinner. He said that he had never made such a statement to any one, and that the statement was not true. Witness was not related to the defendant.

Dave Schrympsher testified, for the defense, that on the first Saturday in January, 1883, he went to Perry Houk's house to see him and collect some money due him by Houk. From there he went with Houk to Simmon's mill, and en route Houk told him that it was not true that the defendant had tried to hire him to kill Doctor Skinner. He also told the witness in the same conversation that he had been before the grand jury, but was not asked about the reported attempt of the defendant to hire him to kill Skinner.

On his cross-examination, the witness stated that he and defendant had been good friends for ten or fifteen years, but were not related. The witness's brother had married the defendant's sister. Witness did not go to Houk's to " pump " him about this

case, but, as stated, to collect money due him. He found Houk about ready to go to mill, and accepted his invitation to accompany him. He had known Houk for ten or fifteen years, and they were good friends.

Abi Lawson, for the defense, testified that in a conversation with Perry Houk about this case, Houk told him that he, Houk, had been telling around that defendant had tried to hire him to kill the deceased, but that it was not true; that defendant never did offer to hire him to shoot deceased. He also told the witness that he had understood that the defendant's friends were trying to involve him in the murder of Skinner.

On cross-examination, the witness denied that he had ever advised Perry Houk to leave the country, or offered him money wherewith to procure a horse for that purpose.

Mack Hale testified, for the defense, that he was in Greenville on Saturday, December 9, 1882, and from there went to Doctor Skinner's that night, with the doctor's son Bob, arriving at the house about dusk, when they washed and went in to supper. While at supper witness heard that the doctor had come, and got up and went out. Medes Griffin assisted the doctor out of his buggy, the latter saying that he had been shot. Witness remained at the house two or three minutes, and then returned to town for the doctors.

When witness and Bob Skinner reached Doctor Skinner's house the lamps were burning. Doctor Skinner got to the house about a half hour after witness did. No one else was there except the witness, the doctor's family, Medes Griffin and a boy named Peteets. The doctor's two grown daughters went out on the gallery. Medes Griffin's wife was in the hall. In answer to questions asked him, the doctor said that he did not know who did it, but that he was shot on Caddo bridge. Witness did not return to Skinner's from town that night, but went next morning, and, meeting the sheriff, went with him to the bridge.

Cross-examined, the witness said that, two or three minutes after Doctor Skinner had been taken into his room, he asked the doctor who shot him, and the doctor replied that he did not know. When the witness went to town, he was not authorized to get the sheriff. He met the sheriff next day, but did not know whether or not Doctor Skinner had sent for him. Witness did not know when the defendant was arrested. He, witness, left the sheriff and others at the bridge. That officer said

nothing about arresting any one. At that time an indictment was pending against the defendant for an assault with intent to kill the deceased. Witness had known defendant since boyhood, and they were special friends, but the witness could not say that Doctor Skinner knew that fact. Witness could not be mistaken about Doctor Skinner's answer to the question: "Who shot you?" propounded by witness. This question was asked two or three minutes after the doctor was taken into the house. His answer was not a refusal to tell, but was that he did not know. Mrs. Skinner, Griffin and others were present, and the witness presumed they heard what was said. Deceased was a physician, and forty-five or fifty years old. Witness had known him five or six years, and was on good terms with him and his family. The way witness came to be at Skinner's house that night was this: He was with Bob Skinner in town during the day, and remarked that he was going out to Condon's. Thereupon Bob proposed that if witness would go by home with him he would accompany witness to Condon's.

Levi Warren testified, for the defense, that he lived a half mile southwest of the bridge. He did not see either the defendant or the deceased on the day that the latter was shot. Dave Pitts and witness were hunting that day. He saw York Hunnicutt and Mrs. Mitchell about night. He saw Mart. Short at the Van Sickle's school house, going toward Van Sickle's. Short's wife was with him. Witness went on home, hunting birds, and tried to shoot a rabbit on the way. He got home after sundown. He heard a gun fire that night, and it was then as dark as it was at any time that night. It made a loud report, and the witness thought it was fired east of him, toward the bridge. Witness had eaten his supper and was then skinning a rabbit.

Cross-examined, the witness stated that he recollected the day of his summons before the inquest, and that he then had a conversation with Colonel Jones, counsel for the State, in the presence of Mr. Collier and York Hunnicutt. He did not think that in that conversation he told Colonel Jones that it was not dark, and that he did not know in which direction the shot was fired. The wind was so high it was difficult to tell which direction the report came from. Witness could not say positively from which direction he heard the report, but his impression was that it was from the east.

Defendant here introduced an indictment against W. R. Skin-

ner for an assault with intent to murder defendant, indorsed with the names of the witnesses and the verdict "not guilty."

W. W. Collier testified, for the defense, that he represented W. R. Skinner in the prosecution on the indictment just read. That indictment and the one against defendant for assault to murder the deceased grew out of the same transaction. Mack Hale was a material witness in the prosecution against the deceased. Jeff. Hamilton was the principal witness for the defense in Skinner's case, and defendant, John and Mack Hale were the principal witnesses for the State.

The material part of the testimony of the defendant's father-in-law, E. J. Head, was that he lived within a half mile of the bridge, and heard the discharge of a gun in the direction of the bridge on the evening of Saturday, December 9, 1882. He had sat down to eat his supper. He had lights, and outside it was thick dusk.

Cross-examined, the witness stated that an hour was the period of time elapsing between sundown and the close of daylight. It was not totally dark when he heard the shot, but was dusk. Defendant lived a mile and a half or more from witness. From the bridge to Van Sickle's the nearest possible route is a mile, and to accomplish the journey in that distance a man would have to be familiar with the woods and go through them. A man on horseback would have to go around a wire fence, and to go around it on the east he would have to travel a mile and a half in going from the bridge to Van Sickle's. Defendant had been married about eighteen months, and had not been engaged in the sewing machine business since his marriage.

Dave Pitts next testified for the defense. The substance of his testimony was that he met York Hunnicutt, about sunset, some two hundred yards from his, witness's, house. Hunnicutt was then a good half mile from his house, and had about ten pounds of flour on his shoulder. Hunnicut was on foot, on the Terrell road.

Parilee Head, the defendant's sister-in-law, who lived with her father a half mile from the bridge, testified that she heard a shot in the direction of the bridge that night. It was after dark.

Stephen Parker testified, for the defense, that he lived within a quarter of a mile of Doctor Skinner, and was sick in bed on the day and night that the latter was shot. Witness heard no hallooing at Skinner's house until seven o'clock that night. His attention was directed to the time by Bud Mobley, who came

into the house at that time and called witness's attention to the hallooing. It is two miles from Skinner's to the bridge, over very good roads.

B. A. Van Sickle testified, for the defense, that defendant passed his house on Saturday, December 9, 1882, between nine and eleven o'clock, saying that he was going to see Jim Hale. He returned to witness's house before sundown, stayed there until bed time, playing cards, when the witness left him and went to bed, and found him at his house next morning. Defendant, Sam. Van Sickle, Mart. Short, and others perhaps, were playing cards when the witness went to bed. Short and his wife passed that night at witness's house, having come there about twilight. The defendant had then been at the witness's house at least a half hour. His horse had been taken to the lot some fifteen or twenty minutes.

Cross-examined, the witness stated that it was two miles from his house to defendant's. Defendant's wife was not with him that night. Short and wife, Sam. and Henry Van Sickle, and witness's wife and daughter were at witness's house that night. Henry Van Sickle lived at Baton Rouge, but had been at witness's house for two nights before that Saturday night. He was to return on Thursday. Witness did not know whether or not he went. Henry was witness's nephew. It was a mile and a half from witness's house to the bridge. Going around the pasture, east, to the bridge made but little difference. Witness was in the house and yard all evening. The defendant had his horse put up about dusk. He was not in the house all of the time after he came, but part of the time was in the front and back yards. Witness did not think that Sam. Van Sickle was with defendant all the time. Short was with him part of the time. Defendant did not sleep in the same room witness did. Defendant came to witness's house that evening when the sun was a half hour high or higher. Defendant took supper at witness's house about dusk—the usual supper hour. Witness could state on his oath that defendant did not leave his house that night after he got there. Nothing but the fact that witness was sitting outside reading, at the time that defendant reached his house, enabled the witness to locate the hour of the defendant's arrival as he did. No other particular occurrence enabled him to locate the time, but he knew that the sun was a half or three-quarters of an hour high. The after occurrence did not enable the witness to fix the time. Defendant came from the west on

the pasture road, and not on the Terrell road. He rode a black pony. Witness heard no remark about defendant's pony being placed in the lot that night, for witness had no lot. Witness had expressed his opinion about this case just as any citizen would do. Witness did not think he had ever said, in the presence of Stewart and Dawson, in Greenville, that defendant had a right to kill Skinner, and that he did kill him. He may and perhaps did say, in speaking of the first shooting affray, that defendant then had a right to kill Skinner, and, if he had, would not have been hurt for it.

Mrs. B. A. Van Sickle testified, for the defense, that the defendant came to her house about a half an hour by sun, and remained there, without leaving the premises, until nine or ten o'clock next morning. Of this fact she was positive. This was Saturday, December 9, 1882, the day Skinner was shot. The cross-examination of this witness failed to shake her testimony in the least, and the witness declared that she and her husband had not talked these circumstances over. Defendant left witness's house about eight o'clock next morning, and went toward his home.

Sam. Van Sickle testified, for the defense, that the last two witnesses, his father and mother, lived with him. He gave an account of his own whereabouts on the fatal Saturday, locating himself in his cotton patch. The defendant came to his house about a half an hour by sun, and remained there continuously until next morning. Witness was at the postoffice that day and saw John Williams and Wiley Murphy there.

Cross-examined, the witness stated that he was not at the bridge on Sunday morning. He slept with defendant and Henry Van Sickle that Saturday night. The mail reached the postoffice that evening between two and three o'clock. It was two o'clock when witness started from home to the postoffice. Witness remained at the postoffice until the mail came, and returned home some fifteen or twenty minutes before defendant arrived. Witness denied that, in the office of Judge Sherrell, in the presence of Sam. Stinson and John Martin, he stated that defendant arrived at his house about three o'clock p. m. Witness was mistaken in stating that he, defendant and Mart. Short slept together, if he made such statement at any time. They played cards together. Defendant reached witness's house before Short and his wife did on that evening. Witness and defendant were feeding their horses when Short arrived. Witness denied that,

at the depot in Greenville, he was asked by old man Hinson: "Sam, why did you shoot Doctor Skinner?" and that he replied: "I didn't do it—Mart. Hart did it." He did not hear the defendant exclaim during the night: "Sam, let's run; yonder comes Ross." Defendant had no gun at witness's house that night; and got none at witness's. There was no gun at the witness's house.

Mart. Short was the next witness for the defense. His testimony was in substance that he and his wife reached Captain B. A. Van Sickle's a little before dark, on the evening of the shooting, and remained there all night. He did not see Sam. Van Sickle immediately on reaching the house, but saw him first in about a quarter of an hour, which was just before dark. Supper was not yet on the table. After supper the witness, the defendant, Sam. and Henry Van Sickle engaged in a game of euchre at cards. Witness and wife slept in the south room; defendant, Sam. and Henry Van Sickle in another room, and in the same bed. Witness repeated that it was not dark when he reached B. A. Van Sickle's, and that he did not see the defendant and Sam. when he first got there; and stated that they came into the house about an hour later, and it was not then dark. Farther on in his testimony he said: "I cannot say positively how long it was after I got there before Sam. Van Sickle and the defendant came into the house, but think it was about fifteen or twenty minutes; and Sam. and the defendant came in before the lamps were lit. We all, Sam., Henry, Hart, I, my wife and Doches Van Sickle (B. A. Van Sickle's daughter) slept in the same room that night." Here the defense closed.

Jim Higdon testified, for the State, that defendant was his step-uncle. Witness knew the double barreled shot gun owned by his, witness's, father. It was a tolerably good gun, and made a loud report. Defendant had borrowed it about a month before the tragedy, and had it borrowed at the time Skinner was killed.

Cross-examined, the witness stated his father was a gunsmith. When the defendant borrowed the gun he brought his own to be repaired. When he borrowed it he said he wanted it to hunt hogs with. Witness had seen that gun shoot short distances. At a distance of twenty feet it would not scatter shot over a space of six inches.

John D. Martin testified that he had been to Little Caddo bridge since the beginning of this trial. Ross, Perkins, Jones,

Terhune, Stinson and Cushman were there. Witness assisted to measure some distances, but not all of them. A plot being shown the witness, he stated that from the point indicating the pile of wood where the wagon stopped, it was three hundred and twenty-five feet to the bridge. From the road where the wood pile was to the road leading to York's, the distance was one hundred and seventy-five feet. Witness was present in Judge Sherrell's office and heard a conversation between Sam. Van Sickle and Stinson.

Cross-examined, witness said that he could not tell position of the bridge, as the creek makes a curve at that point. The bridge has no railing, and is ten or twelve feet wide, and is considerably higher in the middle than at either end. It is twenty feet from the top of the bridge to the bed of the creek. The point where the negro Bill Ward said he was standing when the shot was fired was in sight of the bridge.

N. J. Ross testified, for the State, that it was from thirteen to fifteen feet from the second bank of the creek to the opposite end of the bridge.

Jeff. Mason testified, for the State, that he had a conversation with defendant at old man Head's, about twelve o'clock on Sunday, the day after the shooting. He told defendant that Colonel Ross (who was the sheriff) wanted to see him at Burnett's. This was as near an arrest as witness had made, though he would have taken him, as Ross had sent him to get and bring the defendant. Witness, however, had not arrested him. Objection that the defendant was in arrest was overruled. Witness told defendant that Ross wanted to see him, and he went without trouble. On the road to Burnett's the defendant asked witness what Ross wanted. Witness replied that Skinner had been shot, and defendant asked if he was dead. His voice trembled at the first word or two, and then he remarked to witness that he did not know but that Arnold would surrender him on his bond.

Cross-examined, the witness stated that he did not tell defendant where Skinner was shot. Defendant told witness that he was at Van Sickle's on the night of the shooting. About a week before the shooting Arnold told witness that he wanted to get off of defendant's bond.

Medes Griffin testified, for the State, that he was present when Mack Hale asked Skinner who shot him. Skinner replied: " Ask me no questions." If, in answer to Hale's question, Doctor Skinner used the words: " I don't know," witness did not

hear them. On cross-examination, the witness said that there was a great deal of noise about the house from the time Doctor Skinner came home until about eleven o'clock.

Mrs. Skinner testified, for the State, that, in answer to Mack Hale's question as to who shot him, deceased did not use the words "I don't know."

The motion for new trial presented the questions involved in the opinion of the court.

*E. W. Terhune, Perkins, Gilbert & Perkins,* and *Updegrove & Hefner,* filed an able and exhaustive brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. A challenge was made to the array of grand jurors who presented the bill of indictment in this cause, because the record failed to show that they had been drawn and selected by jury commissioners duly and legally appointed at a previous term of the court, in conformity with the provisions of the statute. (Code Crim. Proc., Arts. 352 to 361 inclusive.) On a demurrer to this challenge filed by the district attorney, the court, over objection of defendant, heard testimony establishing that in fact the commissioners were selected and qualified as required by law, and that the failure of the record or minutes to show it was from inadvertance or omission of the clerk to make the proper entry; and the minutes were corrected so as to show the fact—the demurrer being also sustained to the challenge.

We are of opinion the court did not err in sustaining the demurrer. Only two causes of challenge to the array of the grand jury are permitted under our statute (Code Crim. Proc., Art. 380), and the ground upon which the challenge was here made does not come within either of the two named. Independent of these two grounds there is no mode known to our law by which, after its organization is completed, the array of the grand jurors can be attacked and impeached. And this has been the established rule of practice in Texas since the adoption of our Codes. (*Reed* v. *The State,* 1 Texas Ct. App., 1, and authorities cited.)

It is now expressly provided by statute that "any person, before the grand jury have been impaneled, may challenge the array of jurors or any person presented as a grand juror, and in

no other way shall objections to the qualifications and legality of the grand jury be heard. Any person confined in jail in the county shall, upon his request, be brought into court to make such challenge." (Code Crim. Proc., Art. 377.)

In Kemp's case, 11 Texas Court of Appeals, 174, the question is thoroughly discussed and settled, since the adoption of the Article last quoted, and it was there held that "the right to impeach the qualifications or the legality of a grand jury is limited to the time prescribed, and confined to the causes specified; and a prisoner who has omitted to request that he be brought into court to make the challenge, cannot impeach the grand jury by pleading in abatement of the indictment preferred against him." The same rule obtains in Mississippi. (*Logan* v. *The State*, 50 Miss., 269.)

A motion was made by defendant to postpone the trial because he had not been served with a true copy of the indictment, in this, to wit, that the copy served upon him did not have indorsed upon it the names of the witnesses indorsed upon the original. It is contended that, inasmuch as it is required that "the attorney representing the State shall indorse upon the indictment the names of the witnesses upon whose testimony the same was found" (Code Crim. Proc., Art. 413), this indorsement becomes as much a part and parcel of the indictment as any other portion, and that the certified copy required by law to be served upon him (Code Crim. Proc., Arts. 504, 505) must embrace it, or the service upon the defendant is defective and insufficient. We are cited to numerous authorities outside our State in support of the position.

Whatever may be the rule, or reason of the rule, in other States, the question has long been a settled one in Texas. In the early case of *Steele* v. *The State*, 1 Texas Reports, 142, it was held that the statute requiring such an indorsement upon the back of an indictment was merely directory, and that such indorsement is not a constituent part of the indictment or of the finding of the grand jury, and is not essential to its validity. In the case of *Skipworth and Bowles* v. *The State*, 8 Texas Court of Appeals, 135, it is said: "While the statute prescribes that the names of the witnesses upon whose testimony the indictment is found shall be indorsed on the indictment (Code Crim. Proc., Art. 413), yet no mode is designated by which a failure to do so can be reached, and in the absence of further legislation the omission must be held as immaterial. No exception either

of form or of substance lies to an indictment on that account (Code Crim. Proc., Arts. 528, 529), and a motion to quash, strictly speaking, is not known to the Code. (Code Crim. Proc., Art. 522.)"

Even in States where it is made essential to the validity of the indictment that the names of the witnesses who testified before the grand jury shall be indorsed thereon, the rule has never, so far as we are aware, been held to preclude the prosecution from introducing in support of the accusation other witnesses whose names are not so indorsed. (*State* v. *Fowler*, 52 Iowa; S. C., 2 Crim. Law Mag., 45; *Lawrence* v. *Comm.*, 30 Gratt., 845; 6 Biss., 321; 50 Ala., 102; Id., 164; 52 Ala., 182; Id., 192.) It was held, in *Cotton* v. *The State*, that "when an offense is proved as charged in an indictment, the fact that the witnesses on whose testimony the bill was found knew nothing about the particular offense proved cannot be availed of as a defense. A defendant has no right to institute an inquiry into the intention of the grand jury otherwise than as expressed in the indictment found by them." (43 Texas, 169.)

We know of no rule which would authorize a defendant to demand a postposement of the trial of his case until he could be served with a copy of the names of the witnesses indorsed upon the indictment. Doubtless it would be the better practice for the clerk, in making out the certified copy of the indictment, to copy all the indorsements upon it; but we know of no statute or provision of law requiring that *the certified copy* shall contain such indorsements. In this instance it is not contended that the original was not so indorsed, or that defendant was precluded or denied the right of examining the names of the witnesses upon it.

The challenge to the array of the petit jurors, based upon the same ground as was the challenge to the grand jury, viz., that the jury commissioners which selected them were not properly appointed and qualified, was rightly overruled, the evidence showing, as before stated, that their appointment and qualification were in full compliance with law, and that the clerk had simply failed to make the appropriate record entry of the fact.

On the trial, many objections were urged to the introduction in evidence by the State of the written testimony of Doctor Skinner, the deceased, taken at the examining trial of defendant just after the shooting, and upon a charge of assault with intent to murder Skinner. A day or so after the shooting, de-

féndant was arrested, charged with assault with intent to murder. Complaint had been filed with a justice of the peace of precinct No. 1 of Hunt county, and he proceeded to hold, and did hold, an examining trial, which resulted in his binding defendant over to answer to the charge. Skinner lived in precinct No. 2 of Hunt county, and at the time of the examining trial was confined to bed from the wounds he had received. The justice went from his precinct into precinct No. 2, and took the testimony of Skinner, the defendant being present in person and by attorney, and cross-examining the witness. After Skinner's testimony was taken, defendant waived a further examination, and was bailed to answer the charge of an assault with intent to murder. A few days subsequent to this trial, Skinner died of his wounds; and when the grand jury assembled defendant was indicted for the murder of, instead of an assault with intent to murder, Skinner.

It was a primary objection to the testimony that the offense for which defendant was on trial in this case was not the same as the one for which he was on trial when Skinner gave the testimony produced, and that therefore it was inadmissible in this case. This position is untenable. It is a rule growing out of necessity, but now well established, " that, if there has been a prior proceeding involving the same issue, between the same parties, conducted regularly in pursuance of law, and therein the defendant had the opportunity to cross-examine the witnesses against him, then, if a witness has died, what he testified at the former hearing may be shown in evidence against the defendant in the present one. In the circumstances thus explained, the testimony of the witness at a former trial of the same cause, or another cause presenting the same issue, between the same parties, may be shown in evidence." (1 Bish. Crim. Proc., secs. 1195, 1196, and notes.

Under our Code, "the deposition of a witness taken before an examining court or a jury of inquest, and reduced to writing and certified according to law, in cases where the defendant was present when such testimony was taken, and had the privilege afforded him of cross-examining the witness, may be read in evidence, if oath be made that since his deposition was taken the witness has died." (Code Crim. Proc., Arts. 772–774.)

In England, testimony before the examining magistrate on a charge of felonious wounding was deemed admissible on the trial for murder, where the injured person had died of the wound.

15

(*Reg.* v. *Beeston*, Dears, 405; *Rex* v. *Radbourne*, 1 Leach, 4 ed., 457.) To the same effect is *O'Brian* v. *Connor*, 6 Bush., Kentucky, 563.

But again, it is said the testimony was inadmissible because taken without any authority of law by the officer taking it, he being a justice of the peace for precinct No. 1, the testimony being taken in precinct No. 2, and that, too, when there was a duly qualified and competent justice, fully authorized to act in all matters calling for the exercise of the functions of his office, in the latter precinct.

After providing generally for the jurisdiction of justices, the Constitution declares that they may have "such other jurisdiction, criminal and civil, as may be provided by law, under such regulations as may be prescribed by law." (Const., Art. 5, sec. 19.) In prescribing their powers and jurisdiction, Article 1543, Revised Statutes, provides that "they shall also have and exercise jurisdiction over all other matters not herein before enumerated that are or may be cognizable before a justice of the peace under any law of this State." With regard to the final trial of causes coming within his jurisdiction, whether civil or criminal, the statute evidently contemplates that the action and jurisdiction of the justice's court shall be limited by and to his precinct, unless otherwise expressly authorized by the law in certain exceptional cases. But he is furthermore a "magistrate," made so by terms of the statute equally with judges of the Supreme Court, Court of Appeals, district and county judges (Code Crim. Proc., Art. 42), and "when a magistrate sits for the purpose of inquiring into a criminal-accusation against any person, this is called an 'examining court.'" (Code Crim. Proc., Art. 63.) At such time he is a "magistrate" and not a "justice of the peace," and his court is an "examining" and not a "justice's court." A warrant of arrest may be issued by a magistrate (Code Crim. Proc., Art. 232), and when issued by a judge of the Supreme Court, Court of Appeals, District or County Court, shall extend to every part of the State (Code Crim. Proc., Art. 237); but, when issued by any other magistrate it cannot be executed in any other county, except in certain instances mentioned. (Code Crim. Proc., Art. 238.) It may, however, be issued to and executed anywhere in his county outside of as well as in his own precinct. When sitting as an "examining court," the law nowhere limits the magistrate, if he be a justice, to his particular precinct; and, not being limited in this regard, there is no

reason why it was not intended that he should hold the court in any portion of the county most convenient for the purposes of the examination as to the commitment or discharge of the accused (Code Crim  Proc., Chap. III), whether the place of the sitting be in the precinct of another justice, competent and qualified to act, or not.

Without discussing *seriatim* the many questions raised as to this testimony, we deem it necessary to say, that in our opinion the predicate for its introduction was fully laid, the testimony properly and sufficiently taken and certified in obedience to the statute (Code Crim. Proc., Art. 267), and that the court did not err in permitting it to be read as evidence in the case.

Nor did the court err in the rulings shown by the fifth bill of exceptions.  Defendant proposed to prove by his witness Mark Short that " when he, witness, first got to Captain B. A. Van Sickle's the night Skinner was shot, he, Short, asked where Sam. was, and that Captain Van Sickle said he was out in the yard with Mart. Hart, feeding their horses."  The proposed testimony was *res inter alios acta,* was irrelevant and inadmissible.

An indictment against defendant Hart for assault with intent to murder Skinner on the sixth day of December, 1880, about two years before the killing. and which indictment was still pending, was read in evidence by the prosecution, over objection of defendant.  As stated by the court in allowing the bill of exceptions reserved to its introduction, it was admitted to show motive for the killing on the part of defendant.  For such purpose it was perfectly legitimate.  " Whenever the motive or intent of a party forms part of the matter in issue upon the pleadings, evidence may be given of other acts not in issue, provided they tend to establish the intent of the party in doing the acts in question.  (Roscoe's Crim. Evid., 3 ed., 99.)  The reason for this rule is obvious.  The only mode of showing a present intent is often to be found in proof of a like intent previously entertained.  The existence in the mind of a deliberate design to do a certain act, when once proved, may properly lead to the inference that the intent once harbored continued and was carried into effect by acts long subsequent to the origin of the motive by which they are prompted."  (1 Greenlf. Evid., 13 ed., sec. 53 and note 3).  The prosecution has the right to offer any evidence tending to prove a motive for the commission of crime.  (*State* v. *Larkin,* 11 Nev., 314.)

As shown by the seventh bill of exceptions, the State was per-

mitted to produce and identify before the jury the clothing worn and the buggy rug used by the deceased at the time he was shot —which were perforated by bullet holes.   Objection was made, and sustained as far as it was proposed to offer the articles of clothing and rug as evidence in themselves, but was overruled in other respects, and the witness was permitted to identify the articles; to state that they were the clothing and rug worn and used by deceased on the day and at the time of the shooting, and to exhibit to the jury in what part of each of the articles the bullets had penetrated, and in which the holes were to be seen. Several objections were and are urged to this testimony, the principal ones being: " Because such testimony cannot be made a part of the record herein, and is not of such a character as can be incorporated in the record for the Court of Appeals," and "Because it proved nothing, but was calculated to prejudice the jury, and was in their minds evidence put before them, that they as men could not easily discard."   These objections are almost invariably urged whenever the State seeks to avail itself of this character of evidence, and doubtless they spring from certain *dicta* to be found in *Smith* v. *The State*, 42 Texas, 448.   Is it true, or is it a standard test or even a test at all, that the legality and admissibility of evidence depends upon the fact that it must be such as can and must be incorporated into and brought up with the record?   We know of no such rule announced by any standard work on the law of evidence.   If it be true, then the identification, the pointing out of a defendant in court, is not legitimate or admissible, because "he cannot be sent up here with the record."   A witness's countenance, tone of voice, mode and manner of expression, and general demeanor on the stand oftentimes influence the jury as much in estimating the weight they give and attach to his testimony as the words he utters, and "yet they cannot be sent up with the record," though they are fit subjects to be observed by the jury in connection with his testimony, and it is their duty to consider them in passing upon his testimony.   How they have impressed the jury and influenced their verdict are facts known only to themselves—facts which must necessarily be unknown to the defendant, to the trial court, and to this court, save as they may be manifested in the verdict, because they cannot be written in the record; and yet they are and always have been the best and most legitimate sources from which a correct estimate of the value of oral evidence is drawn.   Our own rules do not require that such mat-

ters of proof be incorporated into the statement of facts. (See Rules for District Courts, 71 *et seq.*) A juror, to be competent and fit for jury service, should not be defective in the organs of *seeing* any more than in his organs of feeling or hearing (Code Crim. Proc., Art. 636, sub-div. 5), and he often sees, and rightly sees and acts upon, many things "which cannot be incorporated in the record." "Evidence includes the reproduction before the determining tribunal of facts either notorious or verified in open court, * * * and, when not matter of notoriety, recognized as such by the court, is adduced only by the parties through witnesses, documents or inspection." (Whart. Crim. Evid., sec. 3.) Whilst it is true "that no matter of fact, that is to say no actual phenomenon of external nature, can in any possible state of human knowledge be a matter of demonstration," it is none the less true that the nearer we approximate demonstration by evidence the better and more satisfactory and convincing that evidence is to the human mind. The doubting Thomas of scripture could not be made to believe that the resurrected Saviour was indeed the dead and crucified Jesus, until permitted to put his fingers into the nail holes shown in the holy hands, and thrust his own hand into the wounded side whence the spear of the Roman soldier let out the life blood of the dying Lord.

In a recent case in England, not at present accessible, the defendant was on trial for selling grain by a false measure. To solve the question of his guilt the court had the supposed false measure and a standard measure brought before the jury, and the grain actually measured from the one into the other in the presence of the jury. Will any one pretend to say that this was not the best and most satisfactory evidence to the minds of the jury which could possibly be adduced of the fact in issue before them? And could not the fact be sufficiently stated in the record so as to apprise this court fully of the nature and character of the evidence and mode of proof upon which the verdict was founded? Clearly so, we think.

In a recent case in Georgia it was held that a pistol used in the commission of a homicide could be and was properly submitted to the jury for inspection. (*Wynne* v. *The State*, 56 Ga., 113.)

Mr. Wharton, in his work on Homicide, says: "Dress, independently of the questions to be hereafter noticed, adds often an important element of indicatory proof. Thus, in a case cited by Taylor there were two cuts in a shirt produced in evidence.

These cuts were near each other and precisely similar, leading to the inference that the knife producing them went through two folds of the shirt. From this, however, it followed that the shirt could not have been on the deceased at the time of the wounding, since if it had been there would have been *three*, not *two* cuts. So on the trial of Stokes for the murder of Fisk in 1873, the condition of the deceased's cloak immediately after the wound, was admitted to show the force and direction of the shot. Nor is it necessary, it has been ruled, that the garments in question should be themselves produced. Their condition can be described by witnesses without such production, *if their non-production is satisfactorily explained. But, if practicable, they should be secured and brought into court*, though before admitting them there should be evidence that they have not been tampered with since the killing." (Whart. on Homicide, 2 ed., sec. 674.) Italics are ours.

But the identical question before us came up in the case of *King* v. *The State*, 13 Texas Court of Appeals, 277, and it was said: "Upon the trial of this case the State, over defendant's objection, was permitted to introduce and exhibit to the jury a coat and pair of pants which were proved to have been on the person of deceased at the time he was shot. Testimony of this character is often times pertinent, material and admissible. (*Hubby* v. *The State*, 8 Texas Ct. App., 597; *Early* v. *The State*, 9 Texas Ct. App., 485.)" See also White & Willson's Texas Digest, section 1307.

In the light of these authorities the clothing and buggy rug of Skinner would have been perfectly legitimate and admissible as evidence before the jury, though they could not have been incorporated into the record, and though it might have been impossible for us to know here, beyond their verdict, to what extent they influenced or affected the jury. If legitimate and competent evidence, the State had the right to introduce them, no matter how the jury might be affected by them.

With regard to the exceptions touching the testimony of the witness Mason, it appears that, whatever may have been his intentions as to arresting defendant, he had not done so, and defendant was not apprised of his intention to do so at the time the conversation transpired about which he testified. It is not made to appear, therefore, that the evidence comes within the rule prescribed by the statute relative to confessions or admissions made under arrest. As to the competency and admissi-

bility of the matters testified to as evidence, it seems to be now well-settled that any indications of a consciousness of guilt by a person charged with or suspected of crime, or who, after such indications, may be suspected or charged with crime, are admissible in evidence against him; and the number of such indications cannot be limited or their nature or character defined. However minute or insignificant they may be, if they tend to elucidate the transaction, they should be admitted. (Whart. Crim. Ev., 8 ed., sec. 751; *McArdory* v. *The State*, 62 Ala., 154; *Handline* v. *The State*, 6 Texas Ct. App., 347; *Noftsinger* v. *The State*, 7 Texas Ct. App., 301; Burrill on Circ. Ev., 466.)

Special exception is taken to the first paragraph of the charge of the court, which is as follows: "The jury are charged that homicide is the destruction of the life of one human being by the act, agency, procurement, or culpable omission of another. The destruction of life must be complete by such act or agency. But, although the injury which caused death might not under other circumstances have proved fatal, yet, if such injury be the cause of death, without its appearing that there has been any great neglect or manifest improper treatment by some other person, such as a physician, nurse or other attendant, it would be homicide; and if the jury are satisfied from the evidence that some one shot the deceased, and inflicted upon him a wound which was not in itself necessarily mortal, and that the wound inflicted produced blood poisoning or any other effect which would result in the death of the deceased, the party inflicting the injury would be as guilty as if the wound was one which would of itself inevitably lead to death." This instruction is in substantial, if not literal, harmony with the statute upon the subject. (Penal Code, Arts. 546, 547, 548.) But it is asked in the brief of counsel: "Under this statement, can the court say that when the wound produces the cause, which cause produces death, that the party inflicting it is guilty of homicide?" A full and complete answer to the interrogatory may be found in the language used by this court when discussing a similar question in the case of *Williams* v. *The State*, 2 Texas Court of Appeals, 282, where it was said: "The general rule, both of law and reason, independent of the articles of the Code, is, that whenever a wound is inflicted under circumstances which render the party inflicting it criminally responsible, if death follows, the person inflicting the wound will be held responsible for the homicide, though the person wounded would have died from other causes, or

would have died from this one, had not others operated with it, provided the wound really contributed, mediately or immediately, to the death. Mr. Bishop lays down the correct rule of law on this question, in which he says: ‘The doctrine is established, that if the blow caused the death, it is sufficient, though the individual might have recovered, had he used proper care of himself or submitted to a surgical operation to which he refused submission, or had the surgeons treated the wounds properly. So, also, if the person would have died from some other cause already operating, yet if the wound hastened the termination of life, this is enough; * * * and the wound need not even be a concurrent cause, much less need it be the next proximate one; for if it is the cause of the cause, no more is required.'" (2 Bish. Crim. Law, sec. 680 and note; 1 Hale, P. C., 428; 3 Greenlf. Ev., sec. 139; 1 Russ. on Crimes, 505; 1 Whart. Crim. Law, 8 ed.. sec. 157.)

Holding, as we have done, and as held by the lower court, that the testimony of Skinner, the deceased, taken at the examining trial, was properly admitted in evidence, then the case was not one of circumstantial evidence, and the court was not required to charge the law applicable to that character of testimony; and the charge is not, therefore. obnoxious to objection urged in that regard. There are no other complaints made to the charge, calling for discussion. In our opinion, it fully and fairly presented the law applicable to the facts of the case.

Six bills of exception, from the eighth to the thirteenth, inclusive, relate to the rulings of the court with respect to the admission and exclusion of testimony proposed by defendant for the purpose of impeaching the State's witness, Perry Houk. It appears that this witness. Houk, sometime before Skinner's death, had been indicted for theft of property belonging to Skinner, and was being prosecuted by Skinner for the theft. His testimony in behalf of the State, in substance. was that in returning from court, where both he and defendant had been in attendance to answer the respective indictments against them, the one for assault to murder Skinner, and the other for theft of Skinner's property, defendant had offered to hire him (the witness) to kill Skinner. He further testified that, on the night after defendant Hart was released on bond at the examining trial for the second assault with intent to murder Skinner, he had met defendant and defendant had told him to keep his mouth shut.

On cross-examination, after laying the proper predicates as to time, place and persons, the defendant's counsel asked the wit-

ness: 1. "If he had not said to Henry Horrocks and his family that Doctor Skinner was the only material witness against him in the case wherein he was indicted for the theft of Skinner's horse, and that he had sworn lies on him (witness), and should not do so again, and that you (witness) intended, the first chance you got, to fill him full of buckshot?"

2. "You say you were afraid of Hart's friends, and you say you never told Bud Lawson that the things it was reported you would swear were not true; now tell to whom you told these different tales on account of fear."

3. The impeaching witness, Schrympsher, was asked: "Did not Perry Houk tell you, at the time about which you have testified, that the reason he had been telling these different tales was that he had heard Hart's friends were trying to saddle the killing on him, and if they wanted to swear lies, he could swear and would swear as many as they could?"

4. The witness Houk was asked if he did not, "in a conversation with one Lawson, tell Lawson that Skinner had sworn a pack of dam lies on you (witness) and that he should never do it again; and did you not to Lawson, then and there, and at other times, threaten to kill Skinner if you got a chance?"

5. After the witness Houk, on cross-examination, had stated that he had told many different statements about what his testimony would be in this case, the State, on re-examination, asked, what caused you to make such statements? To which defendant objected, and the witness was permitted to answer, "it was because I was afraid of the parties who are friends of Hart."

The answers to the first four questions were excluded on objections by the State, and the answer to the fifth was objected to by defendant.

"It is a general rule that a witness cannot be cross-examined as to any fact which, if admitted, would be collateral and wholly irrelevant to the matters in issue, for the purpose of contradicting him by other evidence, and in this manner to discredit his testimony. And if the witness answers such irrelevant question before it is disallowed or withdrawn, evidence cannot afterwards be admitted to contradict his testimony on the collateral matter." (2 Phil. on Evid., 3 ed., p. 398.) His answer cannot be contradicted as to the collateral or irrelevant matter by the party who asked the question, but it is conclusive against him. (1 Greenlf. Evid., 13 ed., sec. 449 and notes; *Henderson* v. *The State*, 1 Texas

Ct. App., 432; *People* v. *McKeller*, 53 Cal., 65; *People* v. *Bell*, Ib., 119; 64 Me., 267.)

Mr. Wharton says: "A witness called by the opposing party can be discredited by proving that on a former occasion he made a statement inconsistent with his statement on trial, provided such statement be material to the issue.   *   *   *   The statement which it is intended to contradict must involve facts in evidence." (Whart. Crim. Evid.. 8 ed.. 482.)   He further says: "When a witness is cross-examined on a matter collateral to the issue, his answer cannot be subsequently contradicted by the party putting the question.   The test of whether a fact inquired of on cross-examination is collateral is this, would the cross-examining party be entitled to prove it as part of his own case, tending to establish his plea?" (Sec. 484.)   "The reason of the above rules is obvious.   If not thus restricted, the investigation might thus branch out into any number of immaterial issues upon the mere question of credibility of witnesses." (*Hildebrum* v. *Curran*, 65 Pa. St.. 59.)

In the application of the rules the difficulty, however, has been in determining when and under what circumstances collateral and to some extent matters seemingly irrelevant would tend to support a defendant's plea. and throw light upon the issue involved.   It is the tendency of modern decision, in behalf of innocence and right, to relax some of the restrictions which have grown out of the rules, because they have been found harsh, unreasonable and unjust.   For instance, the rule that "a third party had malice toward the deceased. a motive to take his life, and the opportunity to do so, and had threatened to do so," was not admissible as evidence in behalf of one accused of the murder—a rule so long established and by such a weight of authority as to be invariable (*Boothe* v. *The State*, 4 Texas Ct. App., 217)—is not the rule as it now obtains in Texas, and especially where that third party was a prosecuting witness who was shown to have been at enmity with the deceased, had threatened his life, had carried weapons for him, and who at the time of the homicide. by his proximity to the place of crime, might himself have committed the deed. (*Dubose* v. *The State*, 10 Texas Ct. App., 230.)

But there is another distinction, and it is a controlling one with regard to the admissibility of evidence to impeach a witness as to matters not germane to the main issue—it is in fact an exception to the general rule that contradictory statements cannot be

proven, or that the answer is conclusive on cross-examination as to matters purely collateral and irrelevant. It is that a witness's answers *as to motives* do not come within the rule. Mr. Wharton says: "A witness's answers as to motives are not open to the criticisms that have been applied to his answers as to prior misconduct. Hence, as has already been seen, it has been held that a witness may be asked whether he has not a strong interest in the case, or hostility to the defendant, and if he denies such interest or bias, that he may be contradicted by evidence of his own statements, or of other implicatory facts. The same rule applies to questions as to quarrels between the witness and the party against whom he is called. It is true that we have cases disputing this conclusion, but it is hard to see how evidence which goes to the root of a witness's impartiality can be regarded as collateral to the issue." (Whart. Crim. Evid., sec. 485.)

A leading case upon the subject is *The State* v. *Patterson*, 2 Iredell (N. C.). 346. Gaston. Judge, says: "With respect to the collateral parts of the witness's evidence, drawn out by cross-examination, the practice has been to regard the answers of the witness as conclusive, and the party so cross-examining shall not be permitted to contradict him. Of late, however, it has been understood that this rule does not apply in all its rigor where the cross-examination is as to matters which, although collateral, tend to show the temper. disposition or conduct of the witness in relation to the cause or the parties." (See also 1 Greenlf. Evid., sec. 450.)

Now in the case before us. if the witness had a motive to kill Skinner, and had threatened to kill him, and he believed that on account of these threats Hart's friends were endeavoring to saddle the murder upon him, and thereby relieve Hart; and he believed further that the struggle as to who had committed the deed would be between himself and Hart, it would certainly furnish a strong motive on his part to try and secure Hart's conviction; and the extent and character of that motive towards Hart was legitimate and admissible to be considered by the jury in estimating his credibility, in the light of the circumstances engendering the motive. We are of opinion the court committed an error in excluding this evidence.

It was not error to refuse to permit the witness to name the friends of Hart of whom he was afraid. and to whom he had told these different tales. That fact would neither have thrown

light on the issue or discredit on the witness. Nor did the court err in permitting the witness to state that he was induced to tell the different tales told by him on account of fear of Hart's friends. This was explanatory of matter drawn from him on the cross-examination.

We believe we have now discussed all the questions presented in this voluminous record, and so ably submitted in the argument and brief of counsel, which demand discussion on this appeal.

Because the court erred in the exclusion of the evidence as indicated above, the judgment must be reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered December 5, 1883.